1   CRAIG J. CANNIZZO (State Bar No. 70379)
    E-Mail:  ccannizzo@health-law.com
2   FELICIA Y SZE (State Bar No. 233441)
    E-Mail:  fsze@health-law.com
3   GREG B SHERMAN (State Bar No. 253832)
    E-Mail:  gsherman@health-law.com
4   **HOOPER, LUNDY & BOOKMAN, P.C.**
    575 Market Street, Suite 2300
5   San Francisco, California  94105
    Telephone: (415) 875-8500
6   Facsimile: (415) 875-8519

7   Attorneys for Plaintiffs

8

9                    **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12   CALIFORNIA MEDICAL              CASE NO. CV 11-9688 CAS (MANx)
     ASSOCIATION, et al.,
13                                   **PLAINTIFFS' MEMORANDUM OF**
                 Plaintiffs,         **POINTS AND AUTHORITIES IN**
14                                   **SUPPORT OF MOTION FOR**
         vs.                         **PRELIMINARY INJUNCTION**
15
     TOBY DOUGLAS, et al.,           Date:   January 30, 2012
16                                   Time:   10:00 a.m.
                 Defendants.         Crtrm.: 5
17
18                                   [Notice of Motion and Motion for
                                     Preliminary Injunction; Declarations
19                                   and Request for Judicial Notice in
                                     Support Thereof; [Proposed] Order
20                                   Thereon filed concurrently herewith]

21

22

23

24

25

26

27

28

*(left margin vertical text)* HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA  94105
TEL.: (415) 875-8500  •  FAX: (415) 875-8519

20424 11.4

## <u>TABLE OF CONTENTS</u>                                    <u>Page</u>

I.    INTRODUCTION ................................................................... 1

II.   FACTUAL BACKGROUND ................................................... 1

   A.   Assembly Bill 97 Rate Reduction .................................... 1

   B.   CMS Review of the Rate Reduction and DHCS Refusal to Permit Provider Participation ........................................... 2

   C.   CMS Approval of SPA 11-009 ......................................... 2

III.  LEGAL STANDARD OF REVIEW ........................................ 3

   A.   Standards for Issuance of a Preliminary Injunction ................ 3

   B.   STANDARD OF REVIEW UNDER THE APA ...................... 4

      1.   The Secretary Is Not Entitled To Deference In Her Informal Interpretation of Section 30(A) Regarding the Importance of Reasonable Cost Studies ....................... 5

   C.   The Administrative Record ............................................. 7

IV.   PETITIONERS' STANDING TO CHALLENGE FINAL FEDERAL AGENCY ACTION ......................................... 8

   A.   Plaintiffs Have Standing Under The APA ............................ 8

   B.   Associational Plaintiffs Have Representational Standing .......... 8

V.    THE SECRETARY'S APPROVAL OF SPA 11-009 WAS ARBITRARY AND CAPRICIOUS ........................................ 9

   A.   CMS' Approval Was Internally Inconsistent Because By it Own Concession, It Did Not Have a Comprehensive Plan From Which It Could Determine SPA 11-009 Complied With Federal Law ........... 9

   B.   CMS Failed to Consider the Relevant Factors ...................... 11

      1.   The Secretary Failed to Consider Provider Costs ............. 11

      2.   The Secretary Failed to Compare Medi-Cal Payment Rates to Other Provider Payment Rates for the Same Services ........ 12

   C.   The Record Evidence Demonstrates that SPA 11-009 Does Not Comply with Section 30(A) ............................................. 13

      1.   Physician Services .................................................. 15

      2.   Dental Services ...................................................... 17

      3.   Pharmacy Services .................................................. 18

      4.   Emergency Medical Transportation Services ................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500  •  FAX: (415) 875-8519

2042411.4

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

5.  Durable Medical Equipment Services ..........................................20

VI.  THE DIRECTOR'S IMPLEMENTATION OF THE RATE
REDUCTION CONFLICTS WITH SECTION 30(A) AND
THEREFORE IS PREEMPTED UNDER THE SUPREMACY
CLAUSE...............................................................................................21

VII.  THE RATE REDUCTION RESULTS IN AN UNCONSTITUTIONAL
TAKING AS TO EMERGENCY PROVIDERS ...............................22

VIII.  THE RATE REDUCTION WILL CAUSE IRREPARABLE HARM...........23

IX.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST ...................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

20424411.4

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Dept. of Health & Soc. Svcs. v. CMS*,
  424 F.3d 931 (9th Cir. 2005) ............................................................ 11

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .......................................................... 4

*Alvarado Community Hosp. v. Shalala*,
  155 F.3d 1115 (9th Cir. 1998) .......................................................... 7

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*,
  273 F.3d 1229 (9th Cir. 2001) ..................................................... 5, 11

*Arkansas Medical Soc. v. Reynolds*,
  6 F.3d 519 (8th Cir. 1993) ............................................................. 22

*Asarco, Inc. v. EPA*,
  616 F.2d 1153 (9th Cir. 1980) .......................................................... 7

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*,
  159 F.3d 1178 (9th Cir. 1998) .......................................................... 9

*Benally v. Hodel*,
  940 F.2d 1194 (9th Cir. 1990) .......................................................... 8

*Beno v. Shalala*,
  30 F.3d 1057 (9th Cir. 1994) ..................................................... 5, 7, 12

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  563 F.3d 847 (9th Cir. 2009) ................................................. 22, 24, 25

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  630 F. Supp. 2d 1144 (C.D. Cal. 2009) ............................................. 8

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  596 F.3d 1098 (9th Cir. 2010) ...................................................... 8, 25

*Camp v. Pitts*,
  411 U.S. 138 (1973) ....................................................................... 7

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

*Chevron v. Nat'l Res. Def. Council*,
  467 U.S. 837 (1984) ................................................................4, 5, 6, 7

*Christensen v. Harris County*,
  529 U.S. 576 (2000) .................................................................... 6

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ....................................................................4, 7

*Clark v. Kizer*,
  758 F.Supp. 572 (E.D.Cal. 1990) ........................................14, 16, 17

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) .................................................................... 8

*Dominquez v. Schwarzenegger*,
  596 F.3d 1087 (9th Cir. 2010)..................................................3, 22, 25

*Forest Guardians v. Dombeck*,
  131 F.3d 1309 (9th Cir. 1997) .................................................... 4

*Gen. Chem. Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987).................................................... 5

*Georgia Nursing Home Ass'n v. State of Georgia*,
  1997 WL 820966 (N.D. Ga. 1997)..............................................22

*Golden Gate Restaurant Ass'n v. City & County of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008) ....................................................25

*Hunt v. Wash. State Apple Advertising Comm'n*,
  432 U.S. 333 (1997) .................................................................... 8

*Hyatt v. Heckler*,
  807 F.2d 376 (4th Cir. 1987) ...................................................... 4

*Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*,
  572 F.3d 644 (9th Cir. 2009) ...........................................passim

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*,
  543 F.3d 1050 (9th Cir. 2008) .................................................... 8

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983) .................................................... 4

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

iv

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

*McCartin v. Norton*,
  674 F.2d 1317 (9th Cir. 1982) ...........................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*,
  463 U.S. 29 (1983) .............................................................................................5

*N.J. Protection & Advocacy v. N.J. Dep't of Edu.*,
  563 F. Supp. 2d 474 (D.N.J. 2008) ...................................................................9

*Nat'l Cable Telecom. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ...........................................................................................4

*Newton-Nations v. Betlach*,
  660 F.3d 370 (9th Cir. 2011) .........................................................................5, 7

*Ocean Advocates v. U.S. Army Corps of Engineers*,
  402 F.3d 846 (9th Cir. 2005) .............................................................................4

*Orthopaedic Hosp. v. Belshe*,
  103 F.3d 1491 (9th Cir. 1997) ...................................................................passim

*Penn. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002) ..............................................................................9

*SEC v. Sloan*,
  436 U.S. 103 (1978) ...........................................................................................4

*United States v. Mead*,
  533 U.S. 218 (2001) ...........................................................................................6

*Wilder v. Virginia Hosp. Ass'n*,
  496 U.S. 498 (1990) .........................................................................................10

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...............................................................................................3


FEDERAL STATUTES

5 U.S.C. § 702 ............................................................................................................8

5 U.S.C. § 705 ............................................................................................................4

5 U.S.C. § 706(2)(A) .................................................................................................4

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

42 U.S.C. § 1395dd .............................................................................. 23

42 U.S.C. § 1396a(a)(30)(A) ........................................................... passim

42 U.S.C. § 1396n(f)(2) ......................................................................... 3


**FEDERAL REGULATIONS**

42 C.F.R. § 430.10 ............................................................................ 9, 10

42 C.F.R. § 430.15(b) ............................................................................ 6

42 C.F.R. § 447.252(b) ........................................................................... 3

42 C.F.R. § 489.24 .............................................................................. 23


**STATE STATUTES**

Government Code §§6250 ..................................................................... 10

Health & Safety Code § 1317 ............................................................... 23

Health & Safety Code § 1797 ............................................................... 23

Welfare & Institutions Code § 14105.192 ........................................ 2, 22


**OTHER AUTHORITIES**

75 Fed. Reg. 26342 (May 6, 2011) .................................................. 13, 19

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

## I.   **INTRODUCTION**

Plaintiffs bring this motion to stop California from slashing its already-lowest-in-the nation Medi-Cal rates for outpatient services by an additional 10 percent. Contrary to assertions of Defendant Toby Douglas, the Director of the California Department of Health Care Services ("Director"), which were accepted by Defendant Secretary of the United States Department of Health and Human Services ("Secretary"), this rate reduction will have disastrous consequences for California's Medi-Cal beneficiaries and the healthcare providers dedicated to their treatment. Extensive evidence before the Director and Secretary make it plain that this rate reduction would force large numbers of Medi-Cal patients to go without needed medical treatment and access to critical life-saving drugs, leaving scores of Medi-Cal beneficiaries without access to appropriate care. Defendants turned a blind eye to this evidence. They should not be permitted to implement the rate reduction because it violates the Medicaid Act and the Takings Clause and Supremacy Clause of the Constitution, and will cause irreparable harm to California Medi-Cal beneficiaries, including the individual beneficiary Plaintiff to this case.

## II.   **LEGAL BACKGROUND**

Each state's Medicaid plan must ". . . assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general public in the geographic area . . ." 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)"). Section 30(A) has been interpreted to mandate that Medicaid reimbursement rates be reasonably related to provider costs and based on responsible cost studies. *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1493 (9th Cir. 1997) ("*Orthopaedic*"), *cert. denied*, 522 U.S. 1044.

## III.   **FACTUAL BACKGROUND**

### A.   **Assembly Bill 97 Rate Reduction**

On March 25, 2011, Section 93.5 of Assembly Bill 97 of 2011 ("AB 97")

20424411.4

1  enacted Welfare and Institutions Code § 14105.192 ("Section 14105.192"), which

2  authorizes the Director to reduce the Medi-Cal rates for various outpatient services

3  by ten percent, effective June 1, 2011 (hereafter "Rate Reduction"). The legislation

4  declares that the need to reduce provider payments was due to the state's "economic

5  crisis." Welf. & Inst. Code § 14105.192. Implementation is to occur only to the

6  extent that the Director determines that provider payment rates are "higher than

7  required under the standard provided in Section 1902(a)(30)(A) ["Section 30(A)"]

8  of the federal Social Security Act and can be reduced in accordance with federal

9  law." *Id*. The services affected by the Rate Reduction include physician, clinic,

10  dental, pharmaceutical, emergency medical transportation ("EMT") and durable

11  medical equipment ("DME") and medical supply services.

### B.   CMS Review of the Rate Reduction and DHCS Refusal to Permit Provider Participation

14  The Director submitted a proposed SPA 11-009 to CMS on June 30, 2011

15  seeking approval of the Rate Reduction. RJN, Exh. 1. In response, Plaintiffs

16  submitted requests to examine the supporting documentation submitted by the

17  Director to CMS under the California Public Records Act (Cal. Gov. Code §§6250

18  et seq.), but the Director refused to provide Plaintiffs with access to these materials

19  even though he was under a mandatory duty to do. Cannizzo Decl., ¶ 3.

20  Even though Plaintiffs were denied an opportunity to timely review the

21  materials submitted by the Director to CMS, Plaintiffs submitted comments to CMS

22  explaining that the proposed rate reductions would harm beneficiary access to

23  needed services. *See e.g.,* Cannizzo Decl., ¶¶ 3, 23-27. The providers sent these

24  comments to ensure that CMS was aware that Medi-Cal beneficiary access would

25  fall below the minimum requirements of the Medicaid Act, despite the Director's

26  assurances to the contrary. *Id.*

### C.   CMS Approval of SPA 11-009

28  On September 27, 2011, Gloria Nagle, the Assistant Regional Administrator

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

2042411.4

2

1   from CMS Region IX, sent a letter to Toby Douglas requesting additional

2   information pursuant to 42 U.S.C. section 1396n(f)(2). RJN, Exh.2. This Request for

3   Additional Information ("RAI") included a list of eleven inquiries that CMS had

4   determined the Director needed to address in order to allow CMS to appropriately

5   assess whether the rate reduction called for in the SPA 11-009 would be consistent

6   with the Medicaid Act. *Id.*

7        By letter dated October 27, 2011, CMS approved SPA 11-009. RJN, Exh. 3.

8   In its approval letter, CMS stated that "the State was able to provide metrics which

9   adequately demonstrated beneficiary access to care in accordance with section

10  1902(a)(30(A) of the Act."  There is no reference in the CMS approval letter to

11  efficiency, economy, quality of care, or the relationship between Medi-Cal rates and

12  provider costs. *See Id.*

13       On that same day, CMS sent a "companion" letter requesting a corrective

14  action plan from DHCS to correct areas in which SPA 11-009 is "not in compliance

15  with current regulations, statute, and CMS guidance."  RJN, Exh. 4. CMS expressed

16  concern that the State Plan lacked a comprehensive description of the methods and

17  standards used to set payment rates. *Id*. CMS informed DHCS that "[a]bsent the

18  descriptions of these criteria, CMS will not be able to determine that the State plan

19  language meets the requirements set forth in 42 C.F.R. 447.252(b), 42 C.F.R.

20  447.10, and Section 1902(a)(30)(A) of the Act [Section 30(A)]."  *Id.*

21  **IV.**   **LEGAL STANDARD OF REVIEW**

22       **A.**      **Standards for Issuance of a Preliminary Injunction**

23       In order to obtain a preliminary injunction, Plaintiffs must establish that: (1)

24  they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm

25  in the absence of preliminary relief, (3) the balance of equities tips in their favor,

26  and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council,*

27  *Inc.*, 555 U.S. 7 (2008); *see also Dominquez v. Schwarzenegger*, 596 F.3d 1087,

28  1092 (9th Cir. 2010). In the alternative, "[a] preliminary injunction is appropriate

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

3

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    when a plaintiff demonstrates that serious questions going to the merits were raised

2    and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the*

3    *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). A reviewing court

4    has the authority to postpone the effective date of agency action or preserve the

5    status quo pending conclusion of the review proceedings. 5 U.S.C. § 705.

6                 **B.      STANDARD OF REVIEW UNDER THE APA**

7         Under the Administrative Procedures Act ("APA"), a court must hold

8    unlawful and set aside agency action found to be arbitrary, capricious, an abuse of

9    discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). First, the

10   courts are recognized as the "final authority" of questions of statutory interpretation.

11   *SEC v. Sloan*, 436 U.S. 103, 118-19 (1978); *Forest Guardians v. Dombeck*, 131

12   F.3d 1309, 1311 (9th Cir. 1997) ("The interpretation of a statue is a question of law

13   which is… reviewed de novo"). When applying the law, an agency is bound by the

14   precedents of the judicial circuits in which they are operating until those precedents

15   are overruled by the court or displaced with superior authority. *See Lopez v.*

16   *Heckler*, 713 F.2d 1432, 1438 (9th Cir. 1983); *Hyatt v. Heckler*, 807 F.2d 376, 379

17   (4th Cir. 1987). When evaluating whether the Rate Reduction satisfied the

18   requirements of Section 30(A), the Secretary is bound by Ninth Circuit's opinions

19   interpreting those requirements. *See Nat'l Cable Telecom. Ass'n v. Brand X Internet*

20   *Servs.*, 545 U.S. 967, 983 (2005) ("court's prior ruling <u>remains</u> binding law" that is

21   applicable to "agency interpretations to which *Chevron* is inapplicable").

22        Second, in determining whether the Secretary's decision can be sustained, the

23   reviewing court must consider whether the agency's decision was based on a

24   consideration of the relevant statutory factors and whether there has been a clear

25   error of judgment. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 418

26   (1971). The court's review must be "searching and careful." *Id*. Courts "must not

27   'rubber-stamp' administrative decisions . . . deem[ed] inconsistent with a statutory

28   mandate or that frustrate the congressional policy underlying a statute." *See Ocean*

*Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 858 (9th Cir. 2005); *see also McCartin v. Norton*, 674 F.2d 1317, 1320 (9th Cir. 1982). Rather, the court must set aside agency action where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 44 (1983); *see also Beno v. Shalala,* 30 F.3d 1057, 1073 (9th Cir. 1994); *Newton-Nations v. Betlach*, 660 F.3d 370, 378 (9th Cir. 2011). Also, internally contradictory agency reasoning render resulting administrative action "arbitrary and capricious;" such actions are not "'founded on a reasoned evaluation of the relevant factors.'" *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (*quoting Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (finding agency action "arbitrary and capricious" because it was "internally inconsistent and inadequately explained").

  1. <u>The Secretary Is Not Entitled To Deference In Her Informal Interpretation of Section 30(A) Regarding the Importance of Reasonable Cost Studies</u>

  Defendants may contend that this court should defer to the Secretary's interpretation of Section 30(A)'s requirement under the Supreme Court's holding in *Chevron v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984), even though the Secretary's views have not undergone formal rule-making process under the APA and are supposedly "memorialized" in an undated, unsigned memorandum of indeterminate authorship and authority supposedly sent by a CMS Regional Office to someone in the Department of Health Care Services.  RJN, Exh. 8.

  However this precise argument was previously advanced and expressly rejected by the Court of Appeals in *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-*

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

5

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA  94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

*Jolly*, 572 F.3d 644 (9th Cir. 2009) ("*ILC II*"), *cert. granted* 131 S.Ct. 992 (2011). It noted that the Supreme Court had "limited such deference to an agency's interpretation of its own regulations," citing *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000). *ILC II*, 572 F.3d at 654. In *Christensen*, the Supreme Court held that informal agency's interpretations of a statute such as those contained in an opinion letter, policy statement, agency manuals, or enforcement guidelines, all of which lack the force of law, do not warrant *Chevron*-style deference. *Christensen*, 529 U.S. at 587.

For example, in *United States v. Mead*, 533 U.S. 218 (2001), the Supreme Court refused to afford *Chevron*-type deference to a Customs Headquarter Office ruling letter because it was not preceded by notice and comment as under the APA and it was not intended to clarify third-party rights and obligations beyond the specific case. "…Congress contemplates administrative action with the effect of law when it provides a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. Thus, cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication." *Id.* at 230. The Court found noteworthy the fact that forty-six different regional Customs Offices issue thousands of letter ruling every year. *Id.* at 233.

The present circumstances are quite similar to those presented in *Mead.* The Secretary has delegated SPA approval decisions, which number into the thousands every couple of years, to the ten Regional HHS offices. 42 C.F.R. § 430.15(b). Furthermore, those offices are not in fact uniform in their practices or interpretations. RJN, Exh. 9 (United States Government Accountability Office, *Medicaid Managed Care: CMS's Oversight of States' Rate Setting Needs Improvement*, GAO-10-810 (2010)). To paraphrase *Mead*, any suggestion that rulings intended to have the force of law are being churned out at a rate of 1000 every two years at an agency's ten scattered offices "is simply self-refuting." *Mead*,

2042411.4

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL: (415) 875-8500 • FAX: (415) 875-8519

1   533 U.S. at 233.

2         To the extent that the Secretary would contend that *Chevron* deference should

3   extend to the Secretary's reasoning "embedded" in her recent SPA approval

4   decision, the recent Ninth Circuit decision in *Newton-Nations v. Betlach* is

5   particularly instructive as to how the nature of  agency action under review affects

6   the type of deference to be afforded. Citing *PhRMA v. Thompson*, 362 F.3d 817

7   (D.C. Cir. 2004), the Secretary had argued in that case that Medicaid waiver

8   approvals, notwithstanding their <u>informal</u> adjudicatory nature, are properly afforded

9   *Chevron* deference because "the comprehensive nature of the Secretary's authority

10  'to review and approve state Medicaid plans evidenced a congressional 'intent that

11  the Secretary's determinations, based on interpretation of the relevant statutory

12  provisions, should have the force of law.'"  Brief for Appellee at 25, *Newton-*

13  *Nations* (No. 10-16193), 2010 WL 5779632. The Ninth Circuit declined to accept

14  the Secretary's invocation of *Chevron* deference. Relying on *Beno*, the court

15  independently analyzed under the APA whether the Secretary considered the

16  required statutory factors and whether the record "was sufficient to support the

17  agency action."  *Newton-Nations*, 660 F.3d at 381.

18         C.      <u>The Administrative Record</u>

19         Review of an agency's decision is based on the record before the agency

20  when the decision was made. *Overton Park*, 401 U.S. at 420;  *Camp v. Pitts*, 411

21  U.S. 138, 142 (1973). Further, an agency's decision may be upheld, if at all, solely

22  on the basis articulated by the agency in making the decision. *Beno*, 30 F.3d at

23  1073-74 ("[T]he record must be sufficient to support the agency action, show that

24  the agency has considered the relevant factors, and enable the court to review the

25  agency's decisions."). Extra-record material is available for background

26  information, to explain the record, or to determine "whether the agency considered

27  all the relevant factors or fully explicated its course of conduct or grounds of

28  decision." *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir. 1980); *Alvarado*

7

2042411.4

1    *Community Hosp. v. Shalala*, 155 F.3d 1115, 1124 (9th Cir. 1998).

2    **V.**    **PETITIONERS' STANDING TO CHALLENGE FINAL FEDERAL**

3       **AGENCY ACTION**

4       **A.**    **Plaintiffs Have Standing Under The APA**

5       In order to have standing under the APA, a plaintiff must establish that the

6 agency action caused him an "injury in fact" and that this injury is "arguably within

7 the zone of interests to be protected or regulated" by the statute that the plaintiff

8 claims the agency violated. *Benally v. Hodel*, 940 F.2d 1194, 1198 (9th Cir. 1990);

9 5 U.S.C. § 702. The "zone of interests" test is "not meant to be especially

10 demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Section 30(A)

11 establishes the standards by which provider payment are to be set in order to ensure,

12 among other things, beneficiary access. Plainly, Medi-Cal providers and Medi-Cal

13 beneficiaries are within the zone of interests protected by Section 30(A).

14       **B.**    **Associational Plaintiffs Have Representational Standing**

15       The associational plaintiffs have standing to bring this case on behalf of their

16 members and their members' patients. Associations have representational standing

17 when: (1) its members would otherwise have standing to sue in their own right, (2)

18 the interests at stake are germane to the organization's purpose, and (3) neither the

19 claim asserted nor the relief requested requires the participation of individual

20 members in the lawsuit. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S.

21 333, 343 (1997). Courts within this circuit have determined that many of provider

22 associations that bring this action, and their members, have standing to challenge

23 Medi-Cal rate-setting. *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050,

24 1065 (9th Cir. 2008) ("*ILC I*"), *cert. denied* 129 S.Ct. 2828 (2009); *Cal.*

25 *Pharmacists Ass'n v. Maxwell-Jolly*, 630 F. Supp. 2d 1144, 1148-49 (C.D. Cal.

26 2009) aff'd 596 F.3d 1098 (9th Cir. 2010) ("*Cal. Pharm. II*"), *cert. granted* 131

27 S.Ct. 992 (2011).

28       Indeed, as noted above, the providers have been injured by the Secretary's

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

2042411.4

8

1  regulatory action and are within the zone of interests protected by Section 30(A).

2  Moreover, issues related to Medi-Cal reimbursement are particularly germane to the

3  purposes of the associational plaintiffs. *See* Silva Decl., ¶3; Roth Decl., ¶ 3; Bell

4  Decl., ¶ 4; Achermann Decl., 5; Snow Decl., ¶ 4. In addition, it is well established

5  that when an association is pursuing an action for only declaratory and injunctive

6  relief on behalf of its members, participation in the action by individual members is

7  not required. *See Associated Gen. Contractors of Am. v. Metro. Water Dist. of S.*

8  *Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998). Finally, courts have held that because

9  individual medical providers would have third-party standing to represent the

10  interests of their patients, associations representing those providers can also

11  represent the interests of patients. *See, e.g., Penn. Psychiatric Soc'y v. Green Spring*

12  *Health Servs., Inc.*, 280 F.3d 278, 288-94 (3d Cir. 2002); *N.J. Protection &*

13  *Advocacy v. N.J. Dep't of Edu.*, 563 F. Supp. 2d 474, 481-84 (D.N.J. 2008).

14  Accordingly, the associational plaintiffs have standing to bring this action on behalf

15  of their members and their members' Medi-Cal patients.

16  **VI.   THE SECRETARY'S APPROVAL OF SPA 11-009 WAS ARBITRARY**

17  **AND CAPRICIOUS**

18  CMS completely failed to consider whether SPA 11-009 complied with

19  federal law. CMS' companion letter acknowledges that it could not determine

20  compliance. CMS also failed to consider relevant Section 30(A) factors in approving

21  the Rate Reduction, including, among others, provider costs, quality of care, and

22  efficiency and economy. Further, CMS's approval in light of these factors, and the

23  one factor it claims to have considered, access to services, runs counter to the

24  evidence before the agency.

25  **A.   CMS' Approval Was Internally Inconsistent Because By it Own**

26  **Concession, It Did Not Have a Comprehensive Plan From Which**

27  **It Could Determine SPA 11-009 Complied With Federal Law**

28  42 C.F.R. § 430.10 requires that the State plan be a comprehensive written

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    statement containing all information necessary for CMS to determine whether the

2    plan can be approved. *See also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502

3    (1990).

4         CMS' "companion" letter to the letter approving SPA 11-009 acknowledged

5    that it "reviews SPAs in the context of the overall State plan for consistency with the

6    requirements of section 1902(a) of the Social Security Act[,]" after acknowledging

7    the comprehensiveness requirements of 42 C.F.R. § 430.10. RJN, Exh. 4. The letter

8    went on to state:

9         Section 1902(a)(30)(A) of the Social Security Act (the Act) requires
         that procedures related to payments include a comprehensive
10        description of the methods and standards used to set payment rates.
         Attachment 4.19-B illustrates how non-institutional providers will be
11        reimbursed and <u>must contain comprehensive State plan language</u>. . . .
         Absent descriptions of [criteria related to current payment
12        methodologies], <u>CMS will not be able to determine that the State plan
         language meets the requirements set forth in 42 CFR 447.252(b), 42</u>
13        <u>CFR 447.10, and Section 1902(a)(30)(A) of the Act.</u>.

14   *Id.* (emphasis added).

15        CMS then identified a number of deficiencies regarding the identification of

16   payment methodologies in the State plan, including: (1) inquiring whether all

17   categories of medical assistance are paid by the "general reimbursement

18   methodology" of the lesser of usual charges or the fee schedules specified in Title

19   22 and Title 17 of the California Code of Regulations; (2) requesting the addition of

20   language specifying the location of reimbursement rates and the effective dates,

21   which would need to be revised any time the fee schedule was revised; (3)

22   requesting that DHCS delete language permitting that rates may be adjusted by state

23   statute provided that applicable requirements of 42 C.F.R. part 447 are met; and (4)

24   requesting that DHCS delete language that described how the State's cost and

25   funding would impact the payments for services. RJN, Exh 4. CMS concluded the

26   letter by asking for the State to submit a corrective action plan describing how the

27   State will resolve the issues identified by CMS. *Id*.

28        The companion letter provides CMS' own admission that when CMS

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

approved SPA 11-009, the resulting State Plan did not comply with various federal Medicaid requirements, including the comprehensiveness requirement of 42 C.F.R. section 430.10 and the requirement imposed by Section 30(A). Moreover, CMS' inquiry indicates that at the time CMS approved SPA 11-009, CMS <u>did not know what California's current reimbursement rates actually were</u>. By its own admission, then, CMS could not determine that the resulting rates complied with Section 30(A), as indicated in the approval letter for SPA 11-009. Such internally contradictory agency reasoning renders the resulting administrative action "arbitrary and capricious." *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1236.

### B.    CMS Failed to Consider the Relevant Factors

#### 1.    The Secretary Failed to Consider Provider Costs

The relevant factors include, at a minimum, the factors set forth in Section 30(A):  efficiency, economy, quality of care, and equal access. In considering efficiency, economy and quality of care, CMS must also consider whether DHCS relied on credible cost studies and developed rates that are reasonably related to provider costs. *Orthopaedic*, 103 F.3d at 1492, 1496, 1500 (9th Cir. 1997). In *Alaska Dept. of Health & Soc. Svcs. v. CMS,* 424 F.3d 931, 939 (9th Cir. 2005), the Secretary asked the court to uphold her disapproval of a SPA proposed by the state of Alaska because the state failed to analyze provider costs:

> "The requirements of § 1396(a)(30)(A) are … not so flexible as to allow the [State] to ignore the costs of providing services. For payment rates to be consistent with efficiency, economy, quality of care and access, they must bear a reasonable relationship to provider costs."

*Alaska*, Resp. Br., 2004 WL 3155124 at p. 32, citing *Orthopaedic*, 103 F.3d at 1499.

For unexplained reasons, the Secretary has reversed her views regarding the necessity of considering provider costs. The Secretary's and the Director's failure to consider provider costs, quality, efficiency and economy is demonstrated by CMS's undated memo to the Director (RJN, Exh. 8), CMS's Request for Additional Information (RJN, Exh. 2), the materials DHCS submitted to CMS, (Cannizzo

Decl., Exh. 39-43), and CMS's Approval Letter (RJN, Exh. 3). The RAI focuses almost exclusively on access. (The Secretary's consideration of beneficiary access is equally spurious as explained below at section VI.C, *infra*.) DHCS' materials focused exclusively on access, did not address providers' financial losses or the impact of the rates on quality of care. *See generally* Cannizzo Decl., Exh. 39-43. Similarly, CMS's Approval Letter does not discuss provider costs, efficiency, economy, or quality, let alone contain findings that the Rate Reduction is consistent with these factors. *See* RJN, Exh. 3. The record contains no indication that either CMS or the Director considered provider costs, or the impact of the Rate Reduction on efficiency, economy, or quality. Indeed, the Director has conceded that he did not consider provider costs in setting the reduced rates. Cannizzo Decl., Exh. 44.

Under these circumstances, CMS's approval of SPA 11-009 must be set aside. The courts "may not infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals." *Beno*, 30 F.3d at 1073. The record demonstrates CMS's unexcused failure to consider factors expressly required to be considered by binding Ninth Circuit precedent, even where these factors have been brought to the agency's attention.

2.   <u>The Secretary Failed to Compare Medi-Cal Payment Rates to Other Provider Payment Rates for the Same Services</u>

The Secretary's proposed rules under Section 30(A) make clear the kinds of information she considers essential in order to make such an assessment of beneficiary access. The proposed rule states that access comparison must include an analysis of Medicaid payment data which includes the following:

(1) an estimate of the percentile, which Medicaid payment represents of the estimated average customary provider charges.

(2) an estimate of the percentile, which Medicaid payment represents of one, or more, of the following: Medicare payment rates, the average commercial payment rates, or the applicable Medicaid allowable <u>costs</u> of the services.

76 Fed. Reg. at 26361-62, 42 C.F.R. Proposed Rule § 447.203(b)(1)(B) (emphasis

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    added).

2         In a national report issued by CMS virtually concurrent with its approval of

3    SPA 11-019, CMS performed the very rate comparison that California itself refused

4    to consider or submit as part of its SPA approval application. CMS found that

5    California's Medicaid health care expenditures per enrollee were the lowest in the

6    nation in 2009 (the most recent year of comparison). RJN, Exh. 7, p. 49. California's

7    per enrollee expenditures were 33% less than the U.S. national average and a

8    shocking 57% less than the per enrollee expenditures in more populous states such

9    as New York. *Id*. CMS also compared Medicare health care spending per enrollee

10   by state of residence for the most recent reporting year. In contrast to Medi-Cal,

11   California Medicare expenditures per enrollee were above the national average (one

12   of only fourteen states to be above the national average). *Id.* at p. 48. Most

13   noteworthy, comparing California's aggregate expenditures per capita, CMS found

14   the California's Medicaid expenditures were only 42 percent of those for Medicare

15   enrollees. *Id*.

16        In analyzing both Medicare and Medicaid total healthcare expenditures per

17   enrollee, CMS found that, generally, those states with higher or lower expenditure

18   levels tended to correspond to the higher or lower per capita income levels in those

19   states. Not so in the case of California. As noted by the report, "<u>California stands out

20   because of its very low Medicaid payment levels</u>," which were not explainable

21   based on a correlation with any other indicators. RJN, Exh. 7, p. 49.

22        **C.    <u>The Record Evidence Demonstrates that SPA 11-009 Does Not</u>**

23        **<u>Comply with Section 30(A)</u>**

24        Contrary to the Secretary's approval letter, the content of the administrative

25   record before the Secretary did not "demonstrate a baseline of beneficiary access

26   that … is consistent with Section 30(A)."  RJN, Exh. 3. The record before the

27   agency included survey findings that Medi-Cal enrollees are less likely to say the

28   health system is meeting their needs or report having regular access to health care

1    compared to other insured Californians. Silva Decl., exh. 2. Seventeen percent of

2    Californians reported going to a hospital emergency room because they could not

3    get an appointment with a doctor or clinic, which is four times the rate of other

4    insured Californians.  *Id.*

5           Entirely missing from the Director's analyses are any meaningful comparison

6    of the Medi-Cal population to the general population, any analyses of access on a

7    local geographic level, any analyses based on the actual healthcare needs of the

8    Medi-Cal population, or any attempt to project any impact on access based on the

9    Rate Reduction.  Cannizzo Decl., exhs. 40-42; *see Clark v. Kizer*, 758 F.Supp. 572

10   (E.D.Cal. 1990) *aff'd in part vacated in part*, 967 F.2d 585 (9th Cir. 1992) (finding

11   California Medi-Cal program violated federal "equal access" standard because level

12   of dentist "full participation" in program fell below 50% standard where

13   reimbursement was 40% of their usual and customary rates and in some cases below

14   providers' costs). Section 30(A) requires that care and services be available to Medi-

15   Cal beneficiaries at least to the extent that [they] are to the general "insured

16   population" in the geographic area. *Id*. at 576. The failure to perform any geographic

17   analysis obscures real problems in access. *See, e.g.,* Crall Decl., ¶¶ 37, 43. Neither

18   the Director nor the Secretary can point to any evidence submitted as part of the

19   SPA review process comparing Medi-Cal beneficiary access to the general

20   population. In the absence of such comparative information, the Secretary's

21   approval must be set aside for failure to consider the relevant statutory factors.

22          Moreover, the Director's and CMS's reliance on the monitoring plan

23   (Cannizzo Decl., Exh. 43) as a substitute for a true access study is unavailing. That

24   monitoring plan is suspect because: (1) it relies on measures that are inaccurate

25   determinants of beneficiary access (*see* Grumbach Decl., ¶ 41, Zuckerman Decl., ¶

26   29, Crall Decl., ¶ 44), (2) the measures are not sensitive enough to detect beneficiary

27   access problems (*see* Gorospe Decl., Exh. 2, p. 5), and (3) the monitoring plan does

28   not permit DHCS to remedy any access problems in a timely fashion.  *See* Gorospe

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

14

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

Decl., Exh. 2, p. 5, Zuckerman Decl., ¶ 29.

### 1.   Physician and Clinic Services

The record produced by CMS to Plaintiffs reflects a multitude of input from medical providers and others attesting to the fact that Medi-Cal rates for physician and clinic services prior to the implementation of the ten percent rate reduction were insufficient and had been so for a long time. *See, e.g.,* Cannizzo Decl., Exh. 3 (CMA letter stating Medi-Cal payments per enrollee among lowest in the nation), 7, 20. Many medical providers and organizations, among other entities, commented to CMS that as a result of the low physician participation due to low payment rates, Medi-Cal beneficiaries experienced impaired access to medical services, especially non-primary care specialty services. *See, e.g., id.* at Exh. 3 (stating that Medi-Cal patients have difficulty finding specialists, and must often travel long distances or experience unnecessary delays), 8, 9 (typical wait times of three weeks to three months exist for certain specialties). These commenters represented to CMS that approval of the Rate Reduction would only further erode access by Medi-Cal beneficiaries to medical services. *See, e.g.*, *id.*, Exh. 3, 7, 8, 9. Some of these commenters provided research literature to CMS and the record includes other research literature documenting the low rates for medical services paid by the Medi-Cal program, the low Medi-Cal participation rates by California physicians, access barriers to medical services faced by Medi-Cal beneficiaries, and the increased utilization of emergency rooms and clinics in the absence of private physician participation in Medi-Cal. *See, e.g., id.*, Exh. 9, 10, 14, 15, 23, 32, 34, 38.

The evidence before CMS included the following research findings: (1) Out of 66,480 practicing physicians in California in 2008, only two-thirds reported treating some Medi-Cal patients as a part of their practice with lower participation rates among non-primary care specialists than primary care physicians (*id.* at Exh. 14); (2) a small proportion of physicians (~25%) care for the vast majority of Medi-Cal beneficiaries (~80%) (*id.*); (3) Medi-Cal rates were 59% of Medicare rates in

15

2042411.4

2003, then fell to 56% of Medicare rates in 2008, ranking California 47th among all states compared to Medicare rates. *Id.* at Exh. 11. See also *Clark v. Kizer*, 758 F.Supp. at 576-577 (holding Medi-Cal rates violated Section 30(A) due to low level of "full participation" of providers due to low reimbursement rates).

Despite this overwhelming evidence that Medi-Cal rates prior to the Rate Reduction were not ensuring sufficient access to medical care, the Director attempted to sway CMS otherwise by submitting to CMS a report called "Physicians, Physician Groups, Clinics, and Hospital Emergency Departments: Measuring Access to Medi-Cal Covered Healthcare Services." *Id.* at Exh. 40. In section 6 therein, the Director posits that physician participation in Medi-Cal is sufficient such that a ten percent reduction would not adversely impact beneficiary access. The Director's representations are clearly erroneous because (1) he consistently and grossly overrepresents the number of physicians in California and the number participating in Medi-Cal, relying on uninterpretable paid claims data; and (2) he consistently fails to adjust his counts of physicians to his counts of beneficiaries when calculating beneficiary to physician ratios. *See* Grumbach Decl., ¶¶ 12-28, 37, 43. The result is that the Director's analysis obviously and grossly underestimates the number of beneficiaries to physicians throughout section 6 of his analysis. *Id.*

Section 7 of the Director's analysis attempts to demonstrate that because utilization rates among Medi-Cal beneficiaries demonstrate sufficient access that will not be impaired by a ten percent rate reduction. However, this analysis of utilization data is inadequate because: (1) it does not account for the level of patient need and (2) it does not account for the type of provider serving the beneficiary or the site of service. *See* Zuckerman Decl., ¶¶ 8-11, 12-21.

In light of the other evidence before CMS, it was arbitrary and capricious for CMS to accept the Director's representation as to physician participation in Medi-Cal as the Director's analysis was clearly based on obviously unsound data, and

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

2042411.4

incoherent and illogical methodologies.

### 2. Dental Services

CMS and other governmental agencies have for years identified a lack of access to dental services by Medi-Cal beneficiaries. In response to continuing access problem, in 2001, CMS issued a letter to all State Medicaid Directors in which it stated that "significant shortfalls in beneficiary receipt of dental services, together with evidence that Medicaid reimbursement rates that [sic] fall below the 50th percentile of providers' fees in the marketplace, create a presumption of noncompliance with" Section 30(A). Crall Decl., Exh. 11. Since the issuance of that letter, CMS targeted California as one of 16 states with low dental utilization rates for site visits in 2008 and in the report culminating from that site visit, identified four recommendations for California related to access to dental services. *Id*. at ¶¶ 13-14, Exh. 2. A 2010 Government Accounting Office report stated that California had the seventh lowest dental utilization rates (24.5% of children using any preventive dental services) in the United States. *Id.* at ¶ 19, Exh. 4. The Director's own annual reports to CMS confirm these consistently low utilization rates. *Id.* at ¶ 23, Exh. 6-9. The Centers for Disease Control ("CDC") also publishes a State Oral Health Profile that demonstrates that there are large geographic areas of California where Medi-Cal beneficiaries cannot access dental services and that a limited number of dentists regularly see Medi-Cal beneficiaries. *Id.* at ¶ 24, Exh. 10.

In the context of this background, it was arbitrary and capricious for CMS to approve SPA 11-009 as to pediatric dental services. Based on CMS' own 2001 all State Medicaid Director letter, CMS should have disapproved the Rate Reduction because California has historically had low dental utilization rates and its fees fall below the 50th percentile of providers' fees in California. *See Id.* at ¶ 28, Exh. 11. *See Clark v. Kizer*, 758 F.Supp. at 576-577 (holding Denti-Cal rates violated Section 30(A) due to low level of "full participation" of dentists due to low reimbursement). Moreover, the analysis presented by the Director in the document entitled,

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    "Medi-Cal Fee-For-Service Access Analysis: Durable Medical Equipment, Clinical

2    Laboratory, Emergency Medical Transportation, Non-Emergency Medical

3    Transportation, Home Health & Dental Services" conflicts with the data in the

4    Director's own submissions to CMS and does not include a sufficient explanation as

5    to the Director's methodology to be interpreted. *See* Cannizzo Decl., exh. 41. The

6    Director's analysis includes pediatric dental utilization rates measured by the

7    percentage of children ages 0-20 with an annual dental visit from the years 2007 to

8    2009 and a calculation of the ratio of dental enrollment to the number of rendering

9    dental providers in 2007, 2008, and 2009. These data, presented without a clear

10   explanation of the methodology, appear to be erroneous. For example, the utilization

11   statistics reported by the Director are between 13.8 and 17.0 percentage points

12   higher than what the Director annually reports to CMS or other research literature.

13   *Id.* at ¶¶ 23, 30-31, Exh. 5-9. Similarly, the Director's count of dentists participating

14   in Medi-Cal for 2008 outnumbers those reported by the Centers for Disease Control

15   for the same year without any explanation. *Id.*, ¶ 39, Exh. 10. Without a detailed

16   description of the methodology, CMS could not assess why these discrepancies exist

17   or the veracity of the Director's statistics in light of the evidence in CMS'

18   possession, including CMS' own documentation of California's poor dental

19   utilization rates. It was therefore arbitrary and capricious for CMS to accept the

20   Director's analyses as to Medi-Cal beneficiary access to dental services.

21          3.    Pharmacy Services

22          The record before the Secretary demonstrated that the Director could not

23   implement a ten percent rate reduction to pharmacy services consistent with its

24   obligations under Section 30(A). On July 5, 2011 and October 20, 2011, CPhA

25   provided evidence to CMS demonstrating that a the ten percent reduction to Medi-

26   Cal reimbursement for pharmacy would result in pharmacies being paid less than

27   their costs for most drugs and lead to decreased beneficiary access as the result of

28   pharmacies refusing to provide services to Medi-Cal patients. Roth Decl., Exh. 1

1   (any reasonable pharmacy would be unwilling to provide services when

2   reimbursement falls below cost), 2; *see also* Gorospe Decl., Exh. 2, pp. 1-4.

3   Similarly, NACDS explained to CMS that the ten percent reduction was

4   "shortsighted" and inconsistent with the statutory factor of economy. Bell Decl.,

5   Exh. 1. Specifically, NACDS noted that Medi-Cal could save $315 million per year

6   merely by implementing common sense policies that increase utilization of generic

7   drugs. *Id.* Accordingly, the Secretary had ample evidence before her demonstrating

8   that the Rate Reduction to covered drug products and services would decimate

9   beneficiary access to needed pharmaceutical services and that more economical

10  alternatives were available.

11         Despite the evidence before her demonstrating that Medi-Cal rates to

12  pharmacists were already dangerously low, the Secretary apparently relied on a two

13  page report entitled "Analysis and Monitoring of Medi-Cal Pharmacy Access:

14  Provider Availability & Service Utilization," provided by the Director. Cannizzo

15  Decl., Exh. 42. The analysis included several deficiencies. Gorospe Dec., ¶ 7. For

16  example, the data in the Director's analysis used a measure – pharmacy utilization –

17  that is not an accurate indicator of access, and not one of the factors the Secretary

18  determined to be relevant in her proposed rule. Gorospe Decl., Exh. 2, p. 5; 76 Fed.

19  Reg. at 26361. As such, the Department's analysis does not provide the "critical

20  picture of beneficiary access to needed drugs and services," if, for example,

21  providers choose to not dispense certain drugs due to low reimbursement. Gorospe

22  Decl., Exh. 2, p. 5. On a methodological level, the analysis used stale data even

23  though more recent pharmacy data was available. Gorospe Decl., Exh. 2, p. 5.

24         Because the Director failed to conduct a competent access study during the

25  SPA approval process, on December 16, 2011, he was forced to acknowledged that

26  for "selected specific drug products, or for specific types of providers, or in specific

27  geographic areas" the 10 percent payment reduction "may impede access to selected

28  Medi-Cal drug benefits and possibly result in a violation of federal Medicaid law."

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1  RJN, Exh. 6.

2         4.    <u>Emergency Medical Transportation Services</u>

3        On May 16, 2011, American Medical Response, Inc., the California

4  Ambulance Association and the California Fire Chiefs Association sent a letter to

5  CMS that included several hundred pages of documentation – including

6  Government Accountability Office and Institute of Medicine reports – evidencing

7  that the Medi-Cal program's severely below-cost rates for essential ambulance

8  services are negatively impacting access to patient care. *See generally* Wagner

9  Decl., Exh. 1.  Indeed, these materials included independent and industry evidence

10  demonstrating that Medi-Cal rates currently cover only one-quarter of the cost of

11  service and are one-third of Medicare rates. *Id.* at pp. 9, 122-131.

12        Nevertheless, in the two page EMT Analysis provided to CMS, DHCS

13  confidently asserts "it is important to acknowledge that any patient, whether Medi-

14  Cal or other, will receive necessary emergency transportation."  Cannizzo Decl.,

15  Exh. 41. However, "[t]he Department cannot ensure access by relying on regulations

16  requiring" the provision of emergency medical care, "and then refuse to pay the cost

17  of such treatment." *Orthopaedic Hosp.,* 103 F.3d at 1500. CMS decision to approve

18  SPA 11-009 without considering ambulance provider costs ran counter to the

19  evidence before it and was therefore arbitrary and capricious.

20        5.    <u>Durable Medical Equipment and Medical Supply Services</u>

21        CMS acted in an arbitrary and capricious manner by approving SPA 11-009

22  as to DME and medical supplies, based on the Director's analysis in "Medi-Cal Fee-

23  For-Service Access Analysis: Durable Medical Equipment, Clinical Laboratory,

24  Emergency Medical Transportation, Non-Emergency Medical Transportation, Home

25  Health & Dental Services." *See* Cannizzo Decl., Exh. 41. CMS received comments

26  from the DME community that in general, approximately 49% of the revenue to

27  custom rehab providers was spent on the DME themselves, 46% went to operating

28  costs and 5% went to profits. Clayback Decl., Exh. 2. Provider representatives also

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    presented survey results of custom rehab DME providers that 42.1% would severely

2    reduce products and services to Medi-Cal beneficiaries and 10.5% would withdraw

3    from providing products and services to Medi-Cal beneficiaries. Achermann Decl.,

4    Exh. 1; *see also* Knight Decl., Exh. 2 (in survey of custom rehab providers, 88%

5    indicated they would have to drastically reduce the products and services in

6    response to rate reduction), Cannizzo Decl., Exh. 29 (letter from DME provider that

7    10% rate cut could not be absorbed "without substantially reducing quality and

8    access to our care").

9         CMS' decision was arbitrary and capricious in light of the evidence in the

10    record. Based on the financial profile of custom rehab DME companies presented to

11    CMS, CMS knew that a ten percent rate reduction could not be implemented

12    without reducing the services provided to DME clients because these DME

13    companies only have about a 5% pretax profit margin on average. In addition, CMS

14    had ample information before it that a large proportion of DME providers and a vast

15    majority of custom rehab providers would substantially reduce the products and

16    services available to Medi-Cal beneficiaries. There was no analysis with respect to

17    medical supplies. In light of the absence of evidence or analysis by the Director that

18    DME and medical supply providers would continue to serve Medi-Cal beneficiaries

19    after the Rate Reduction, CMS had no basis upon which to conclude that access

20    would be preserved after the implementation of the Rate Reduction.

21   **VII.   THE DIRECTOR'S IMPLEMENTATION OF THE RATE**

22   **REDUCTION CONFLICTS WITH SECTION 30(A) AND**

23   **THEREFORE IS PREEMPTED UNDER THE SUPREMACY CLAUSE**

24        The Rate Reduction conflicts with Section 30(A) because it was enacted and

25    implemented for solely budgetary reasons, without appropriate consideration of all

26    of the factors made relevant by the statute, including the relationship between the

27    resulting provider payment rates and provider costs. It is therefore preempted under

28    the Supremacy Clause. *See ILC II,* 572 F.3d at 651-55; *Cal. Pharm. II.*

21

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    It cannot reasonably be disputed that the sole purpose of the Rate Reduction,

2  and Section 14105.192 more broadly, was to close the State's budget gap. *See* Cal.

3  Welf. & Inst. Code § 14105.192(a). This fact alone renders the Rate Reduction

4  suspect under Section 30(A). *See ILC II*, 572 F.3d at 561, 562; *Cal. Pharmacists*

5  *Ass'n v. Maxwell-Jolly,* 563 F.3d 847, 850 (9th Cir. 2009) ("*Cal. Pharm. I*");

6  *Arkansas Medical Soc. v. Reynolds,* 6 F.3d 519, 531 (8th Cir. 1993); *see also*

7  *Orthopaedic,* 103 F.3d at 1499, n.3. In addition, there is no indication that, in

8  determining to go forward with the Rate Reduction, the Director considered any

9  factors made relevant by Section 30(A) other than beneficiary access to services.

10  *See* Section VI.B. The Director's failure to reasonably consider the impact of the

11  Rate Reduction on efficiency, economy and quality of care also renders the rate cut

12  invalid under Section 30(A) and pre-empted.

13    Finally, the Rate Reduction is preempted by Section 30(A) because the

14  reduced provider rates will have an adverse impact on beneficiary access to care and

15  quality. See section IX. The Ninth Circuit has held that a rate reduction that causes

16  some providers to stop treating Medi-Cal patients can conflict with Section 30(A).

17  *See Cal. Pharm. II*, 596 F.3d at 1114; *ILC II*, 572 F.3d at 656-57.

18  **VIII.  THE RATE REDUCTION RESULTS IN AN UNCONSTITUTIONAL**

19          **TAKING AS TO EMERGENCY PROVIDERS**

20    Due to state and federal laws that require ambulance service providers and

21  emergency room physicians to provide emergency medical services regardless of a

22  patient's ability to pay, the Director's failure to pay these providers adequate rates

23  for their services constitutes an unlawful taking of their property without just

24  compensation. The "Takings Clause" of the Fifth Amendment provides that private

25  property shall not "be taken for public use, without just compensation." U.S. Const.

26  amend. V. Where Medicaid providers are compelled by law to treat Medicaid

27  patients, the failure of a state Medicaid program to adequately pay providers violates

28  the Takings Clause. *See e.g., Georgia Nursing Home Ass'n v. State of Georgia,*

1 | 1997 WL 820966 (N.D. Ga. 1997).

2 | According to Medi-Cal rules and regulations, and other local, state and

3 | federal statutes, emergency ambulance service providers may not refuse to provide

4 | medically necessary services to Medi-Cal recipients, may not bill Medi-Cal

5 | recipients directly for services rendered, may not opt out of the Medi-Cal program to

6 | avoid severely below-cost rates from Medi-Cal, and may not verify program

7 | eligibility until after emergency medical services have been rendered. *See* Health &

8 | Safe. Code §§ 1317, 1797 *et seq.*; 42 U.S.C. § 1395dd; 42 C.F.R. § 489.24; Wagner

9 | Decl., Exh. 1, pp. 26-27. Emergency room physicians are similarly constrained by

10 | law from refusing to render emergency medical services to Medi-Cal beneficiaries

11 | as the result of inadequate reimbursement. Health & Safe. Code § 1317; 42 U.S.C. §

12 | 1395dd; 42 C.F.R. § 489.24; *Orthopaedic Hosp.,* 103 F.3d at 1500.

13 | As a result, the law compels ambulance service providers and emergency

14 | room physicians to treat Medi-Cal patients without adequate compensation. This

15 | constitutes a taking under the Constitution. Since the State will not provide funds

16 | that come even close to reimbursing these providers the cost of treating Medi-Cal

17 | beneficiaries, Wagner Decl., ¶8; Pao Decl., ¶9, they will not be justly compensated

18 | for this taking.

19 | **IX.  THE RATE REDUCTION WILL CAUSE IRREPARABLE HARM**

20 | If the Medi-Cal cuts are implemented, Medi-Cal beneficiaries will suffer

21 | irreparable harm in the form of severely limited access to care. For example, if the

22 | 10 percent reduction goes into effect, no pharmacy in Plaintiff Jennifer Arnold's

23 | community of Redding, California will provide the drug Synagis for her infant son.

24 | Arnold Decl., ¶¶ 7-8; Friesen Decl., 11-14. Because Ms. Arnold's son suffers from a

25 | rare genetic syndrome, without this drug, he is at significant risk of acquiring

26 | infections, such as Respiratory Synical Virus, that would result in hospitalization.

27 | Arnold Decl., ¶¶ 6-9.

28 |

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

1    Countless Medi-Cal beneficiaries will suffer similar access problems because

2    the Rate Reduction will force all varieties of health care providers to stop seeing

3    new Medi-Cal patients or otherwise limit the Medi-Cal beneficiaries they treat. *See*

4    *e.g.,* Sprau Decl. ¶ 10 (pulmonologist/critical care physician will not see new Medi-

5    Cal patients); Mullin Decl. ¶ 10 (OB/GYN will not treat any Medi-Cal patients);

6    Chiang Decl. ¶ 18 (dentist will close office that is dedicated to serving Medi-Cal

7    patients); Dunckel Decl. ¶ 9 (pharmacist will not accept new Medi-Cal patients or

8    fill all Medi-Cal prescriptions). Further, those providers that continue to see Medi-

9    Cal patients will significantly limit the range of services they provide to Medi-Cal

10   patients. *See e.g.,* Stidham Decl., ¶¶ 7-10 (AIDS Healthcare Foundation no longer

11   able to provide same level of services and possibly some drugs to beneficiaries with

12   HIV/AIDS); Taylor Decl., ¶ 9 (will no longer provide delivery services for

13   pharmaceuticals); O'Connell Decl. ¶ 10 (will no longer provide mental health drugs

14   to Medi-Cal patients); Forester Decl. ¶ 10 (dentist will not provide diet education or

15   application of fluoride varnishes); Songster Decl. ¶ 10 (physician will dramatically

16   reduce services to Medi-Cal patients); Rydell Decl. ¶ 11-13 (pediatric dental

17   surgeons to severely reduce services provided to Medi-Cal patients). All of these

18   limitations will result in significant access problems particularly for Medi-Cal

19   patients in communities where there is already a shortage of health care providers

20   serving Medi-Cal beneficiaries and particularly for specialized services. *See e.g.,*

21   Chiang Decl. ¶ 11 (only dental group in local area with hospital privileges that can

22   serve high-risk children); Thompson Decl. ¶ 10 (dentist provides crucial services in

23   rural area where few willing to treat Medi-Cal patients); Mazer Decl. ¶ 10 (one of

24   very few Otolaryngologists in area willing to see Medi-Cal patients); Stidham Decl.,

25   ¶ 10 (HIV/AIDS patients will have to utilize emergency rooms due to less access).

26      In addition, Medi-Cal providers will suffer irreparable pecuniary harm if they

27   cannot recover damages from the defendant due to the Eleventh Amendment's bar

28   of retroactive monetary claims. *Cal. Pharm. I.* Other providers will suffer

1  irreparable harm by being forced to go out of businesses or close locations after

2  years of serving their communities. *See e.g,* Patel, DJ Decl. ¶ 9 (will have to close

3  pharmacy); Cardin Decl. ¶ 9 (physician will close Long Beach office); Friesen

4  Decl., ¶ 9 (pharmacy will close some high volume Medi-Cal stores); Johnson Decl.,

5  ¶ 9 (may close pharmacies); Robert Thompson Decl., ¶ 9 (same); Stidham Decl., ¶

6  8. Countless employees of these Medi-Cal providers will be laid off as a result of the

7  reduced reimbursement. *See e.g.,* Burg Decl. ¶ 13 (children's dental office will lay-

8  off employees); Bhakta Decl. ¶ 9-10 (pharmacy will reduce employees.)

9  **X.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST**

10         The last two elements for determining whether injunctive relief is warranted –

11  the balance of the equities and the public interest – weigh in Plaintiffs' favor. The

12  only interest that the Secretary and the Director can point to is the State's budget

13  difficulties. A state's financial problems do not excuse continued violations of

14  federal law with respect to Medicaid policy decisions. *See ILC II*, 572 F.3d at 659;

15  *Cal. Pharm. I*, 563 F.3d at 852-53, *Cal. Pharm. II*, 596 F.3d at 1114-15; *see also*

16  *Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112,

17  1126 (9th Cir. 2008). Plaintiffs seek to hold the Defendants accountable for

18  disregarding federal Medicaid law and/or the requirements of the APA with respect

19  to the implementation of the Rate Reduction and to prevent the otherwise needless

20  disruption of the lives of Medi-Cal beneficiaries. The equities and public interest

21  militate in favor of an injunction.

22  DATED: December 30, 2011        HOOPER, LUNDY & BOOKMAN, P.C.

23

24                                By:_____/s/_____
25                                        CRAIG J. CANNIZZO
                                  Attorneys for Plaintiffs
26

27

28

HOOPER, LUNDY & BOOKMAN, P.C.
575 MARKET STREET, SUITE 2300
SAN FRANCISCO, CALIFORNIA 94105
TEL.: (415) 875-8500 • FAX: (415) 875-8519

25