TONY WEST
Assistant Attorney General

ANDRE BIROTTE JR.
United States Attorney
Central District of California

SHEILA M. LIEBER
Deputy Director

BENJAMIN L. BERWICK
TAMRA T. MOORE
ETHAN P. DAVIS
E-Mail: Benjamin.L.Berwick@usdoj.gov
Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
Telephone: (202) 305-8573
Facsimile: (202) 616-8470
MA Bar #679207

*Attorneys for Defendant Sebelius*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CALIFORNIA MEDICAL ASSOCATION, et al., | Case No.: Cv-11-09688 (CAS) |
| | OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| vs. | Date:   January 30, 2012 |
| | Time:   10:00 a.m. |
| | Courtroom: 5, Floor 2 |
| TOBY DOUGLAS, et al., | Trial Date: None set |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................3

I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS............3

      A.     CMS's interpretation of Section 30(A), as embodied in its approval of California's SPA, is entitled to *Chevron* deference notwithstanding the Ninth Circuit's decision in *Orthopaedic Hospital* ..........................................................3

      B.     CMS did not act arbitrarily and capriciously in approving California's state plan amendment.......................................9

            1.     *CMS's approval was not internally inconsistent* .....................11

            2.     *CMS properly considered all Section 30(A) factors* ................13

            3.     *CMS reasonably concluded that the rate reductions would not harm beneficiary access to services*..........................................15

CONCLUSION ....................................................................................................25

i

# TABLE OF AUTHORITIES

## CASES

*Alaska Dep't of Health & Soc. Servs. v. CMS,*
    424 F.3d 931 (9th Cir. 2005) ...........................................................6, 15

*Barnes v. U.S. Dep't of Transp.,*
    655 F.3d 1124 (9th Cir. 2011) ...............................................................9

*Barnhart v. Walton,*
    535 U.S. 212 (2002).............................................................................5

*Cal. Med. Transp. Ass'n v. Douglas,*
    Civil Action No. 11-9830 (C.D. Cal. Jan. 10, 2012) ................................. passim

*Cal. Hosp. Ass'n v. Douglas,*
    Civil Action No. 11-09078 (C.D. Cal. Dec. 28, 2011)....................................3, 25

*Christensen v. Harris Cnty.,*
    529 U.S. 576 (2000)...........................................................................7

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)..........................................................................16

*Colo. Envtl. Coal. v. Dombeck,*
    185 F.3d 1162 (10th Cir. 1999) .........................................................19, 23

*Dickson v. Hood,*
    391 F.3d 581 (5th Cir. 2004) ..............................................................6, 8

*Flexible Lifeline Sys. v. Precision Lift, Inc.,*
    654 F.3d 989 (9th Cir. 2011) ...............................................................3

*Greenpeace Action v. Franklin,*
    14 F.3d 1324 (9th Cir. 1992) ...........................................................16, 17

iii

*Harris v. Olszewski,*
    442 F.3d 456 (6th Cir. 2006) ..............................................................6

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    230 F.R.D. 61 (D. Mass. 2005)...........................................................22

*Managed Pharmacy Care v. Douglas,*
    Civil Action No. 11-09211 (C.D. Cal. Dec. 28, 2011)...........................3

*Marsh v. Or. Natural Res. Council,*
    490 U.S. 360 (1989)...........................................................................16

*Methodist Hosps., Inc. v. Sullivan,*
    91 F.3d 1026 (7th Cir. 1996) .............................................................17

*Morongo Band of Mission Indians v. Fed. Aviation Admin.,*
    161 F.3d 569 (9th Cir. 1998) .............................................................16

*Nat'l Cable & Telecom. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005)...........................................................................13

*Orthopaedic Hosp. v. Belshe,*
    103 F.3d 1491 (9th Cir. 1997) ...........................................................13

*Pa. Pharmacists Ass'n v. Houstoun,*
    283 F.3d 531 (3d Cir. 2002) ..............................................................15

*Pharm. Research and Mfrs. of Am. v. Thompson,*
    362 F.3d 817 (D.C. Cir. 2004)..............................................................5

*Rite Aid of Pa., Inc. v. Houstoun,*
    171 F.3d 842 (3d Cir. 1999) ...............................................9, 13, 24

*United States v. Mead Corp.,*
    533 U.S. 218 (2001).................................................................4, 5, 6

*West Virginia v. Thompson,*
    475 F.3d 204 (4th Cir. 2007) ...............................................................9

iv

1

## STATUTES/MISCELLANEOUS

2   76 Fed. Reg. 26342 ......................................................................................7

3
4   5 U.S.C. § 701 *et seq.,*.................................................................................9

5   5 U.S.C. § 706(2)(A).....................................................................................9

6   42 U.S.C. § 1396 *et seq.*..................................................................... passim

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

## INTRODUCTION

This case is about reductions in Medicaid payments for certain health care services – specifically, physician and clinic services, dental services, pharmacy services, emergency medical transportation (EMT), and durable medical equipment (DME) and medical supply services – proposed by the State of California and approved by the defendant, Kathleen Sebelius, Secretary of Health and Human Services ("the Secretary"), acting through her delegate, the Centers for Medicare and Medicaid Services (CMS). Plaintiffs contend that CMS, in approving these payment reductions, failed to consider certain factors – most notably, provider costs – required by Ninth Circuit precedent. Plaintiffs' case is based on the premise that, when evaluating whether the challenged payment reduction satisfied the requirements of the Medicaid Act, specifically 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)"), the Secretary was bound by the Ninth Circuit's opinions interpreting those statutory requirements.

That premise, however, is wrong. As explained below, the Secretary's interpretation of the Medicaid Act, as embodied in her approval of a state plan amendment (SPA), is entitled to *Chevron* deference. And that deference applies even if, as here, CMS's approval of the plan amendment is based upon an interpretation of the Medicaid Act that differs from the one adopted by the Ninth Circuit. This case therefore stands in a fundamentally different posture than those

1

previous lawsuits against the State that did not involve CMS approval of challenged plan amendments.

Furthermore, as shown below, CMS did not act arbitrarily or capriciously in approving California's SPA regarding payment for the services at issue. The record reflects that CMS conducted a careful and thorough analysis spanning three years, considering comments received from third parties as well as relevant studies, and engaging in many discussions with the California Department of Health Care Services (DHCS). As a result of that process, California submitted to CMS several access analyses, as well as a prospective monitoring plan under which California will quickly raise payment rates if an access problem is discovered. Under that monitoring plan, DHCS will collect and analyze data related to beneficiary enrollment, provider availability, and service use and outcomes, and will take "immediate[ ]" action if an access problem arises.

Plaintiffs' case is largely premised on criticisms of the access studies and the monitoring plan, as well as accusations that other material in the record undermines the State's studies. But Plaintiffs' attempt to create a "battle of the experts" is unavailing. As the Fan Declaration attached hereto explains, CMS carefully considered all of the material in the record and came to the conclusion – based on its expertise – that the access studies and the monitoring plan were reliable. CMS's decision to approve the SPA was supported by substantial

2

evidence in the record, and thus CMS acted reasonably in approving the challenged SPA and there is no warrant for overturning the agency's judgment.[1]

## ARGUMENT

"In order to obtain preliminary injunctive relief, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Flexible Lifeline Sys. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011) (internal citations and quotation marks omitted). Plaintiffs cannot satisfy any of these requirements.

### I. Plaintiffs are unlikely to succeed on the merits

#### A. CMS's interpretation of Section 30(A), as embodied in its approval of California's SPA, is entitled to *Chevron* deference notwithstanding the Ninth Circuit's decision in *Orthopaedic Hospital*

This Court has ruled three times that *Chevron* deference does not apply to the SPA approval at issue here. *See California Hospital Association, et al. v. Toby Douglas, et al.*, Civil Action No. 11-09078 (C.D. Cal. Dec. 28, 2011), Order Granting Prelim. Inj., ECF No. 59; *Managed Pharmacy Care, et al. v. Toby Douglas, et al.*, Civil Action No. 11-09211 (C.D. Cal. Dec. 28, 2011), Order Granting Prelim. Inj., ECF No. 46; *California Medical Transportation Association,*

---

[1] Given the Court's familiarity with the facts of this case, the Government has not included a "Background" section.

3

*et al. v. Toby Douglas, et al.* ("*CMTA*"), Civil Action No. 11-9830 (C.D. Cal. Jan. 10, 2012), Order Granting Prelim. Inj., ECF No. 42. The Government will not reiterate its deference argument in full here – we simply incorporate by reference the relevant sections from our briefing in the prior cases. Instead, with respect, we will identify two points that we believe the Court overlooked, in the hope that the Court might reach a different result in this case.

First, in its previous rulings, the Court did not acknowledge the express delegation of interpretive authority here. The Court declined to apply the *Chevron* two-step analysis because the SPA approval "did not involve a formal adjudication accompanied by the procedural safeguards justifying *Chevron* deference." *CMTA*, Order Granting Prelim. Inj. at 10. Although the disapproval of a SPA involves a more formal administrative process, we believe the Court's emphasis on the absence of a formal adjudication here was misplaced. As the Supreme Court has explained, delegation of lawmaking authority "may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). In the case of an *implicit* delegation of authority, the formality of the procedures may be relevant to show congressional intent to delegate lawmaking authority. But where a delegation is *explicit*, the formality of the procedures is irrelevant, as no further evidence is

4

required to show that Congress intended to delegate authority to the agency. *See Mead*, 533 U.S. at 227-29. Recognizing this, *Mead* itself explains that *Chevron* deference may be afforded "even when no such administrative formality was required and none was afforded." *Mead*, 533 U.S. at 230.[2]

Here, there is no doubt that Congress explicitly delegated lawmaking authority to the Secretary to determine whether the SPA satisfies the statutory requirements, including compliance with Section 30(A). *See* 42 U.S.C. § 1396a(b) ("The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) . . . ."). Congress's decision to grant the Secretary the authority to obligate federal funds or initiate a compliance action if she finds that the State is out of compliance with its approved state plan, *see* 42 U.S.C. § 1396c, shows that Congress intended a SPA approval to carry the force of law.

This Court's conclusion to the contrary creates a square conflict of authority with several courts of appeals. Three other circuits have concluded that the Secretary's approval of a SPA is entitled to *Chevron* deference, and their decisions to apply the *Chevron* framework are clearly rooted in this explicit delegation of authority to the Secretary. In *Pharmaceutical Research and Manufacturers of America v. Thompson*, 362 F.3d 817 (D.C. Cir. 2004), which was cited favorably

---

[2] *See also Barnhart v. Walton*, 535 U.S. 212, 221 (2002) ("[T]hat the Agency previously reached its interpretation through means less formal than 'notice and comment' rulemaking . . . does not automatically deprive that interpretation of the judicial deference otherwise its due.").

5

by the Ninth Circuit in *Alaska Department of Health & Social Services v. CMS*, 424 F.3d 931, 939 (9th Cir. 2005), the D.C. Circuit reasoned that, "[i]n the case of the Medicaid payment statute, the Congress expressly conferred on the Secretary authority to review and approve state Medicaid plans as a condition to disbursing federal Medicaid payments." *Id.* at 822. "Through this 'express delegation of specific interpretive authority,' the Congress manifested its intent that the Secretary's determinations, based on interpretation of the relevant statutory provisions, should have the force of law." *Id.* (quoting *Mead*, 533 U.S. at 227).[3]

We believe this Court was also mistaken in finding "the absence of a reasoned decision to not require cost studies" to be significant. *CMTA*, Order Granting Prelim. Inj. at 12. It is the Government's position that a detailed articulation of the agency's reasoning was not necessary here. This is not a case

---

[3] Thus, the Secretary respectfully disagrees with the Court's conclusion that *PhRMA* can be distinguished from the case at hand. *See, e.g., CMTA*, Opinion Granting Prelim. Inj. at 11-12. The D.C. Circuit's holding is based not on any procedural formalities nor on the underlying record, but on the explicit delegation of lawmaking authority by Congress to the Secretary. Nor does the Government agree with the Court that holdings by the Fifth and Sixth Circuits are inapposite. *See, e.g., id.* at 11 n.8; *Harris v. Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006) (explaining that deference was appropriate because, in approving the SPA, HHS was required to find that the SPA satisfied "all statutory requirements" and because, "[i]n carrying out this responsibility, HHS was exercising Congress's 'express delegation of specific interpretive authority'" (citing *Mead*, 533 U.S. at 229)); *Dickson v. Hood*, 391 F.3d 581, 596-97 (5th Cir. 2004) (finding that CMS's approval of state Medicaid plans that provided coverage for incontinence supplies "demonstrate[] that the agency construes § 1396d(7) as encompassing that type of medical care or service").

6

where the reasons behind the agency's interpretation cannot be identified. The Secretary has consistently taken the position that Section 30(A) does not require states to base payment rates on the costs incurred by providers. *See, e.g.*, Br. of the United States as Amicus Curiae, *Douglas v. Indep. Living Ctr.*, No. 09-958, at 9-10 (2010); Br. of the United States as Amicus Curiae, *Belshe v. Orthopaedic Hosp.*, 1997 WL 33561790, at *6-12 (1997); Proposed Rule, Dep't of Health & Human Servs., Ctrs. For Medicare & Medicaid Servcs., 76 Fed. Reg. 26342, 26344 (May 6, 2011). This is because, in CMS's view, cost studies are often extremely difficult to obtain and may not be informative or necessary. Access issues may not arise even if providers are not fully compensated for the cost of providing services, making cost data an unreliable proxy for access. CMS also expressed its position in the record in this case. *See* ECF No. 88-2, Ex. 8 ("CMS does not currently interpret [Section 30(A)] to require cost studies in order to demonstrate compliance. We believe the appropriate focus is on access.").[4] CMS has never

---

[4] In concluding that this expression of CMS's views does not warrant *Chevron* deference, the Court compared the June 17, 2011 memo to the nonbinding opinion letter at issue in *Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000). *See CMTA*, Order Granting Prelim. Inj. at 10. But the government does not ask the Court to defer to the June 17 memo; it asks the court to defer instead to CMS's approval of the SPA. Unlike the memo in *Christensen* that did not carry the force of law, *see* 529 U.S. at 587, a SPA approval undeniably carries the force of law because it obligates federal funds and may be enforced via a compliance action.

7

required cost studies in determining whether a SPA complies with Section 30(A).[5]

CMS applied this longstanding interpretation of Section 30(A) in approving California's SPAs. *Chevron* deference should not turn on CMS's failure to cut and paste or incorporate into the SPA approval letter by reference these prior explanations of its position.[6]

Such a requirement would have enormous practical consequences. The Medicaid Act contains 83 separate requirements that state plans must satisfy. A rule requiring CMS to articulate its position on every conceivable issue of statutory interpretation that might arise would impose an enormous burden on the agency. Such a rule would also be inconsistent with the reasons for affording *Chevron*

---

[5] In declining to give even *Skidmore* deference to the SPA approval, the Court incorrectly asserted that CMS's position on cost studies has been inconsistent. *See CMTA*, Order Granting Prelim. Inj. at 13. The Court relied on the government's brief in *Alaska*, but that case involved the statutory factors of efficiency and economy, not quality of care or access. CMS takes costs into account when determining whether a SPA is consistent with efficiency and economy, as it is reasonable to conclude that payments that dwarf a provider's costs are not efficient or economical. CMS reasonably determined, however, that quality of care and access should be evaluated directly rather than by reference to provider costs. Furthermore, the government's brief in *Alaska* explicitly stated that the Secretary did *not* require cost studies, but only mentioned them as one way that the state could show that its proposed plan amendment complied with efficiency and economy. *See Alaska*, Resp. Br., 2004 WL 3155124, at 31-32 ("[T]he government has not 'required' the State to submit cost data, it has found that the State has shown no justification for departure from the IHS rates, and suggested that a showing of higher costs might be a way to justify an increased rate.").

[6] Neither Plaintiffs nor the Court cited any precedent, and we are aware of none, requiring such a formalistic approach. Indeed, *Dickson* suggests the opposite. *See* 391 F.3d at 594-96 (identifying CMS's interpretation from a variety of sources).

deference to adjudications.  As the Fourth Circuit has explained:

> Agencies are ordinarily permitted to choose in adjudication among permissible meanings of statutes they are charged with administering, without spelling out their interpretations beforehand through notice-and-comment rulemaking. . . .  A contrary rule would stultify the administrative process, ignoring the benefits of adjudicatory development that have led courts to recognize a very definite place for the case-by-case evolution of statutory standards.

*West Virginia v. Thompson*, 475 F.3d 204, 210 (4th Cir. 2007) (internal quotation marks omitted).

### B.  CMS did not act arbitrarily and capriciously in approving California's state plan amendment

Under the APA, 5 U.S.C. § 701 *et seq.*, a "reviewing court may set aside an agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (citing 5 U.S.C. § 706(2)(A)).  "Review under the arbitrary and capricious standard is narrow," and the court should "not substitute [its] judgment for that of the agency."  *Id.* at 1132.  An agency's decision to approve a SPA may be upheld even if the agency "gave some of the section 30(A) factors more attention than others" and even if "a better survey and analysis . . . could have been done." *Rite Aid v. Houstoun*, 171 F.3d 842, 855 (3d Cir. 1999).

Here, CMS reached a considered conclusion, after a three-year process involving substantial submissions from third parties and discussions with providers

and the State, that SPA 11-009 does not violate Section 30(A). That process resulted in the State submitting thorough access analyses to CMS that created "a baseline assessment of the state of access in the Medi-Cal fee-for-service program," including access for the services at issue here. *See* ECF Nos. 124-1 & 124-2, Ex. 40 (access analysis covering physicians and clinics, among other services); ECF No. 124-3, Ex. 41 (access analysis covering DME, EMT, and dentists, among other services); *id.*, Ex. 42 (access analysis covering pharmacies). As part of those analyses, the State considered the characteristics and needs of the Medi-Cal population and actual access to care as measured by provider availability and utilization rates over a three-year period. Based on this data, the State determined whether the rate reduction would negatively impact beneficiary access to care. *See, e.g.*, ECF No. 124-2, Ex. 40 at 68 (concluding that "the proposed payment reduction to physician and clinic services for adults will not negatively impact access"); *id.* (deciding *not* to implement the 10% rate cut for physician and clinic services for children due to utilization rates).

CMS additionally based its decision on California's implementation of a monitoring plan that will measure access to services by geographic area on a continuing basis. *See* ECF Nos. 124-4 & 124-5, Ex. 43. Under that plan, DHCS will monitor a variety of indicators, including Medi-Cal enrollment, provider availability, and service use and outcomes, and DHCS will take "immediate[ ]"

action by raising rates if an access problem is identified. *Id.* at 65.[7]

Although Plaintiffs make much of CMS's failure to rely on third-party studies and information submitted by Plaintiffs and others, CMS considered these submissions and found their analyses unpersuasive as to the points for which they were offered for reasons explained in the Declaration of Kristin Fan, Deputy Director of the Financial Management Group within the Center for Medicaid and CHIP Services, attached hereto. The decision to approve the SPA was informed by the agency's expertise and supported by substantial evidence in the record.

### 1. CMS's approval was not internally inconsistent

As an initial matter, Plaintiffs argue that CMS's letter sent contemporaneously with the SPA approval shows that the agency believed that SPA 11-009 did not comply with Section 30(A). *See* Pls.' Mem. of P. & A. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mem."), ECF No. 20 at 10-11. But this is incorrect, and only shows that Plaintiffs misunderstand the process CMS uses to review SPAs, as well as the contents of the companion letter. CMS first reviews the specific proposed amendment and evaluates whether it complies with the Medicaid Act, including Section 30(A). At the same time, however, the agency may determine that other parts of the State Plan, not at issue in the proposed SPA, may need to be revised to comply with statutory requirements, such as the

---

[7] Thus, Plaintiffs are incorrect that "the monitoring plan does not permit DHCS to remedy any access problems in a timely fashion." Pls.' Mem. at 14.

comprehensiveness requirement of 42 C.F.R. § 430.10. *See* Exhibit A (State Medicaid Director Letter (SMD) #10-020, October 1, 2010). CMS has determined that resolution of these peripheral issues should not delay approval of the proposed amendment. Thus, under its current process for reviewing SPAs, CMS will not refrain from approving an acceptable SPA simply because CMS discovers other issues in the State Plan that need to be addressed.

CMS followed this process in reviewing SPA 11-009. The companion letter in this case provided notice to the State of such issues, and an opportunity for the State to respond either by submitting a new SPA to address those issues or by explaining why changes in the State plan are not necessary. Specifically, the companion letter explains that the State Plan is inadequate because of a number of technical issues, as well as a failure to comprehensively explain certain rates in a way that third parties and auditors would be able to understand on a continuing basis. When CMS considered the proposed rate reductions, it evaluated the data submitted by the state and third parties (including California's fee schedule),[8] determined that the proposed change complied with the Medicaid Act, including Section 30(A), and approved the SPA. The companion letter does not reflect any determination that those rate changes are inconsistent with the statute or

[8] Plaintiffs' argument that "CMS did not know what California's current reimbursement rates actually were," Pls.' Mem. at 11, is incorrect. CMS reviewed the fee schedule submitted by California during the agency's review of SPA 11-009. *See* Decl. of Kristin Fan ¶ 7.

12

unapprovable. It did not indicate any problem with the actual payment rates, only with the level of detail with which they were described. CMS issued the companion letter to begin a separate process to resolve these peripheral issues.

### 2. CMS properly considered all section 30(A) factors

Plaintiffs contend that the Secretary failed to consider efficiency, economy, and quality of care, as required by Section 30(A).[9] *See* Pls.' Mem. at 12. The record reflects precisely the opposite.

The monitoring plan submitted by the State makes clear that it is not simply addressing access to *any* care; it is addressing access to *high quality* care. The State acknowledges, for example, that "[p]rovisions in both Federal and State [law] mandate that administrators ensure access to *high quality healthcare* for its Medi-Cal beneficiaries." ECF No. 124-4, Ex. 43 at 7 (emphasis added). It was not arbitrary to rely on independent provisions in federal and state law that ensure quality of care.[10] *See Rite Aid*, 171 F.3d at 855. The plan also observes that

---

[9] Plaintiffs also argue that the agency's decision was arbitrary and capricious because it failed to consider cost studies. *See* Pls.' Mem. at 11-12. However, as previously explained, the Secretary's position that cost studies are not required under Section 30(A) is entitled to *Chevron* deference, and thus the absence of such studies in this case cannot be arbitrary and capricious.

[10] It is true that *Orthopaedic Hospital* rejected this interpretation of Section 30(A), reasoning that "[t]he Department, itself, must satisfy the requirement that the payments themselves be consistent with quality care." 103 F.3d at 1497. But HHS, in the context of the challenged adjudication (and elsewhere), has reached a different, reasonable interpretation of the statutory language, and that interpretation is entitled to *Chevron* deference. *See Brand X*, 545 U.S. at 982.

13

"monitoring healthcare access provides administrators with a better understanding of whether they are purchasing value in the form of *efficient high quality care* for Medi-Cal beneficiaries enrolled in FFS Medi-Cal." ECF No. 124-4, Ex. 43 at 7 (emphasis added) (internal citation and quotation marks omitted). The plan observes that access should be evaluated in part by reference to "efficiency, economy, and quality of care." *Id.* at 23. And the monitoring plan establishes a toll-free help line that will document calls relating to, among other things, "Health care quality." *Id.* at 29. Finally, the monitoring plan includes specific measures of quality – described as "access outcome measures" – such as preventable hospitalization rates. *See* ECF No. 124-5, Ex. 43 at 55. CMS's acceptance of the monitoring plan as sufficient evidence that quality would not deteriorate is consistent with the text of Section 30(A), which does not require independent direct evidence of quality; it requires only that a state plan include "methods and procedures" to assure that quality will be maintained. It was reasonable to conclude that the monitoring plan constitutes such a "method or procedure."[11]

It is fair to say that the record reflects more concerns about access than about efficiency, economy, or quality of care. As the Secretary has found, concerns

---

[11] The Secretary respectfully disagrees with this Court's conclusion that reliance on the monitoring plan was arbitrary and capricious because it "merely creates a potential response after an access problem has been identified." *CMTA*, Order Granting Prelim. Inj. at 16. Because no study can ever predict with 100 percent accuracy the impact of a SPA on access and quality, a monitoring plan is an ideal "method and procedure[]" to help ensure compliance with Section 30(A).

about efficiency and economy generally arise when the state *increases* payments to providers, not when it decreases them. *See Pa. Pharm. Ass'n v. Houstoun*, 283 F.3d 531, 537 (3d Cir. 2002). For instance, in interpreting the broad terms "efficiency" and "economy," the Secretary has promulgated Upper Payment Limit ("UPL") regulations that "place an upper limit on overall aggregate payments" for certain types of services. 65 Fed. Reg. 60151-01. These regulations are entitled to *Chevron* deference. *See Alaska*, 424 F.3d at 940 ("[T]he undefined terms 'efficiency' and 'economy' leave a gap that the Administrator permissibly filled via case-by-case adjudication.").

### 3. CMS reasonably concluded that the rate reductions would not harm beneficiary access to services

Plaintiffs also claim that CMS failed to adequately analyze the impact of the rate cuts on beneficiary access to services. *See* Pls.' Mem. at 13-21. This argument rests on perceived errors in the access studies and the monitoring plan, and Plaintiffs' contention that other information available to CMS contradicted the State's evidence that the rate cuts would not undermine access.

For three reasons, Plaintiffs' attempts to undermine the State's access studies are unavailing. First, to the extent that Plaintiffs rely on declarations from their own purported experts to attack the methodology of the State access studies, *see, e.g.*, Pls.' Mem. at 16 (citing the Grumbach and Zuckerman Declarations), this

15

information was not before CMS and should not be considered by the Court. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Second, even where Plaintiffs and their experts are able to point to evidence in the record that they allege is contradictory to the State studies, they only succeed in manufacturing a "battle of the experts," and a weak one at that. A plaintiff's showing of expert objections to an agency's analyses and conclusions "is not a sufficient basis . . . to conclude that the [agency's] action was arbitrary or capricious." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992). As the Supreme Court has held, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 577 (9th Cir. 1998).

Even if there were a fatal deficiency in the State access studies (which the Secretary in no way suggests), "[w]hen an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'" *Greenpeace Action*, 14 F.3d at 1336. The access studies submitted by the State were far from "weak," and the Secretary

was well within her discretion in approving the SPAs to accept their conclusions rather than those proffered by Plaintiffs' experts. *Id.*

Finally, as described in more details below for each of the rate cuts being challenged, the agency did consider all of the material in the record cited by Plaintiffs, and for various reasons rejected it as less reliable and/or probative than the State studies. For example, Plaintiffs make much of a CMS report on Medicaid expenditures. *See* Pls.' Mem. at 13. CMS was aware of this study which was used as general background information and helped guide the agency's discussions with California. *See* Fan Decl. ¶ 5(a). However, the study itself does not include specific information related to California that would suggest an access issue for any specific service. *See id.* Similarly, CMS was aware of the survey cited by Plaintiffs, *see* Pls.' Mem. at 13-14, but declined to rely on it too heavily because of specific shortcomings with the data and methodology, *see* Fan Decl. ¶ 5(b). For example, the survey did not differentiate between the Medicaid managed care delivery systems and the fee-for-service system. *See id.*[12]

---

[12] Plaintiffs also claim that the data before the State was inadequate for the required geographic analysis of Medi-Cal service access. *See* Pls.' Mem. at 14. However, CMS interprets Section 30(A) to allow the state discretion to define "geographic area," as long as it distinguishes between urban and rural areas, as California did here. This is a reasonable interpretation of the Medicaid Act that is entitled to *Chevron* deference. *See Methodist Hosps., Inc. v. Sullivan*, 91 F.3d 1026, 1029 (7th Cir. 1996) ("'Geographic area' could mean many things."). Furthermore, both the State and CMS were sensitive to the impact that any rate reductions would have on rural areas. As a result, the State exempted federally qualified health

### a. Physician and Clinic Services

Plaintiffs claim that there was information in the record – in the form of letters from providers and independent studies – that should have led CMS to conclude that the proposed rates were insufficient to ensure access to physician and clinic services. *See* Pls.' Mem. at 15-16. However, CMS considered all of the information before it and determined that the proposed rate cuts would not harm access. Much of the input from providers was very general and did not provide specific examples or data on beneficiary impact. Nonetheless, the letters helped inform CMS's interactions with California. *See* Fan Decl. ¶ 5.

CMS also considered the various studies and research literature included in the record. For various reasons, the agency determined that these studies did not undermine the State's conclusion that the rate reductions would not harm beneficiary access. *See id.* ¶ 5. In general, the data in the outside studies was outdated or irrelevant, such that CMS found the data provided in the California access studies to be more probative. For example Plaintiffs rely heavily on a June 2004 study entitled "Trends: Changes in Medicaid Physician Fees, 1998-2003: Implications for Physician Participation." *See* Pls.' Mem. at 15-16; ECF. No. 99-2, Ex. 11. CMS considered that study but concluded that it was outdated, as the State provided the agency with more recent data. *See* Fan Decl. ¶ 5(h). Plaintiffs also

centers (FQHCs) and rural health clinics (RHCs) from the rate reductions. *See* ECF No. 88-1, Ex. 3 ¶ 16; Fan Decl. ¶ 6(b)(ii).

18

cite frequently to a study entitled "Physician Participation in Medi-Cal, 2008." *See*

Pls.' Mem. at 7; ECF No. 111-2, Ex. 14. CMS considered this study as well, but

found it less convincing than the California study because it relies on physician

self-reporting on Medi-Cal participation, rather than Medi-Cal claims data. *See*

Fan Decl. ¶ 5(i). Furthermore, the studies cited by Plaintiffs do not take into

account the fact that Medi-Cal beneficiaries rely heavily on federally qualified

health centers (FQHCs) and rural health clinics (RHCs) – which were not subject

to the rate reduction – for services. *See id.* ¶ 5.

Finally, Plaintiffs criticize the methodology of the State access study.

However, there was no information in the record indicating that the data provided

by the State was erroneous. To the contrary, the State relied on data that CMS

considers to be quite reliable, as it is used to calculate federal matching

expenditures. *See id.* ¶ 6(a). Thus, it was not arbitrary or capricious for CMS to

rely on the data provided by California. *See Colo. Envtl. Coal. v. Dombeck*, 185

F.3d 1162, 1172 (10th Cir. 1999) (explaining that an agency's decision is neither

arbitrary nor capricious when "the analysis constitutes a reasonable, good faith

presentation of the best information available under the circumstances").

### b. Dental Services

Plaintiffs' claim that it was arbitrary and capricious for CMS to approve a

reduction in payment rates for pediatric dental services, *see* Pls.' Mem. at 17, also

19

misses the mark. Relying on paid claims data, the State's access study that it submitted to CMS showed that the percentage of Medi-Cal enrolled children between the ages of zero and 20 with an annual dental visit between 2007 and 2009 was in line with the national average. *See* ECF No. 124-3, Ex. 41 at 11-12. Indeed, the percentage of children using dental services increased from 45.3% in 2007 to 49.2% in 2009, lending further support to CMS's reasonable conclusion that the rate reductions will not negatively affect access. *Id.* at 12.

In response, Plaintiffs contend that the data presented in the State's access study "conflicts with the data in the Director's own submissions to CMS [in its CMS-416 reports]." Pls.' Mem. at 18. This is not so. There is no conflict because the methodologies used in the CMS-416 reports and in California's access analysis are different. *See* Fan Decl. ¶ 6(d). CMS understands that California's access analysis relied on the National Committee on Quality Assurance's (NCQA's) determination as to the percentage of children with health insurance for 11 months out of the year who had at least one dental visit per year.[13]   *Id.* By contrast, the CMS-416 reports submitted between 2007 and 2009 measured utilization ratios based upon the number of children who had at least one dental visit within a year over the total number of children enrolled in Medicaid that year, even if the

---

[13] Plaintiffs' assertion that the access analysis did not "include a sufficient explanation as to the Director's methodology," Pls.' Mem. at 18, is also misplaced. The access analysis clearly reveals that it is employing the NCQA methodology. *See* ECF No. 124-3, Ex. 41 at 11.

beneficiary had been enrolled for only one month. Plaintiffs might prefer the latter methodology, but on arbitrary and capricious review they are not entitled to insist on it. Moreover, even the methodology that Plaintiffs prefer shows that utilization of dental services among Medicaid beneficiaries increased from 28.3% to 35.4% between 2007 and 2009. *See* Crall Decl. ¶ 23, ECF No. 79 (conceding that "[t]his CMS-416 data may suggest that California may be making some improvements in dental utilization by children, but it is not conclusive"). Under either standard, then, CMS's decision was not arbitrary or capricious.

Finally, Plaintiffs' claim that the CDC's State Oral Health Profile shows that "there are large geographic areas of California where Medi-Cal beneficiaries cannot access dental services," Pls.' Mem at 17, is vastly overstated. In fact, the Profile shows that 53 out of 58 counties have an enrolled Medicaid dentist. ECF No. 79-3, Ex. 10. Plaintiffs are not entitled to compel the Secretary to evaluate geographic access at their preferred level of granularity.

### c. Pharmacy Services

Plaintiffs' challenge to the Secretary's decision to approve the pharmacy service rate reductions contained in the challenged SPA is not based in fact. *See* Pls.' Mem. at 19. Indeed, the *facts* the Secretary considered when she approved the pharmacy service rate reductions were that: (1) California pays pharmacies based on Average Wholesale Price (AWP), a payment metric that is "extremely

21

inflated," ECF No. 88-2, Ex. 8 at 80, with no real bearing on the actual cost pharmacies pay for drugs, *see In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 67-69 (D. Mass. 2005); (2) the inflated AWP metric would allow Medi-Cal pharmacies to "still realize profits even with a 10% . . . rate reduction," *see* ECF No. 123-1, Ex. 39 at 683-85; and (3) in 2008, when the now-enjoined ten-percent payment rate reduction was in effect, Medi-Cal utilization rates for pharmacy services increased and there was no negative impact on pharmacy participation in Medi-Cal. *See* Exhibit B at 6; ECF No. 123-1, Ex. 39 at 737-38. Based on these facts, the Secretary reasonably concluded that the challenged rate reductions satisfied the requirements of Section 30(A).[14]

Plaintiffs' attempt to undermine the access analysis on which the Secretary relied is likewise unavailing. California submitted data that showed that 95 percent of all actively licensed pharmacies participate in the Medi-Cal program and that, in 2008, when a ten-percent rate reduction was in effect, pharmacy utilization increased. *See id.* Based on this data, the Secretary reasonably concluded that the challenged rate reductions would not impede Medicaid beneficiaries' access to 95

---

[14] California's issuance of a December 16, 2011 notice regarding the State's need to increase payment rates for select pharmacy providers and drug products is not, as plaintiffs suggest, evidence that the State's access analysis was flawed. Instead, it shows the efficacy of California's monitoring plan and that the State is monitoring the effects of the challenged rate reductions and taking immediate action to avoid any *potential* access issues.

percent of the licensed pharmacies within the State.[15]   And, to the extent that access issues arise as a result of a pharmacy provider's choice "to not dispense certain drugs due to economic factors," ECF No. 33-1, at 14, California's implementation of a monitoring plan that provides a Medi-Cal help line for beneficiaries to report directly to DCHS any drug access issues, *see* ECF No. 124-5, Ex. 43 at 64-65, will safeguard against these and other potential access that may arise as a result of the challenged rate reductions.

### d.   EMT Services

Plaintiffs argue that the Secretary acted arbitrarily and capriciously in approving rate reductions for EMT, pointing to studies that indicate Medi-Cal pays providers below their actual costs. *See* Pls.' Mem. at 20. Yet, as discussed above, the Secretary does not interpret Section 30(A) to require cost studies, and that interpretation is entitled to *Chevron* deference.   Nonetheless, CMS considered these studies and met with industry representatives to discuss the potential impact of EMT rate cuts. *See* Fan Decl. ¶ 5(q). CMS found more persuasive the State's access analysis, which shows that utilization of EMT services remained constant

---

[15] There is no merit to Plaintiffs' argument that "pharmacy utilization" is not an accurate measure of access and "not one of the factors the Secretary determined to be relevant in her proposed rule," Pls.' Mem. at 19.   The Secretary reasonably concluded that California's submission of data showing that beneficiaries have access to 95 percent of the actively licensed pharmacies in California properly measures how many pharmacies voluntarily participate in the Medi-Cal program notwithstanding any limitations inherent in the sources from which the data was derived. *See Colorado Envtl. Coal.*, 185 F.3d at 1172.

from 2008 to 2011 and that there was an increase in the number of overall providers.  ECF. No. 124-3 at 9-10.  Plaintiffs take issue with this analysis, insisting that CMS improperly relied on regulations requiring the provision of emergency care.  But it was not arbitrary to rely on independent provisions in state and federal law that ensure access to emergency services. *See Rite Aid*, 171 F.3d at 855; *supra* note 10.  Even if it were, to the degree the access study indicates an additional justification for its findings, those statements do not undermine CMS's conclusion, based on utilization and provider participation, that rate reductions would not result in a violation of Section 30(A)'s access requirement.

### e.  DME and Medical Supply Services[16]

Plaintiffs additionally argue that "CMS knew that a ten percent rate reduction could not be implemented without reducing services provided to DME clients." Pls.' Mem. At 21.  The State's access analysis, however, indicates that utilization of DME remained constant over a three-year period despite earlier cuts, *see* Fan Decl. ¶ 5(r), with fluctuations upward, and that the number of available suppliers had increased by 6.1 percent as the population and enrollment expanded.  ECF No. 124-3 at 7-8.  Plaintiffs rely on comments from DME providers

---

[16] Contrary to Plaintiffs' assertions, "medical supply services" are not included in the definition of DME; they are instead listed as a subcategory of "home health services." *See* 42 U.S.C. § 1395x(m)(4), (n).  The State analyzed access to home health services and, based on that analysis, declined to implement the proposed ten-percent reduction for those services. ECF No. 124-3 at 11-12.

24

indicating that, typically, profits account for only five percent of providers' revenue, concluding that a ten-percent rate reduction would therefore necessarily result in reduction of access. *See* Pls.' Mem. at 20-21. That conclusion is based on the faulty assumption that providers are incapable of adapting to new rates. Notably, DME itself accounts for only 49 percent of revenue, while "operating costs" account for a full 46 percent. ECF No. 116 ¶ 8. Further, although DME providers submitted survey results indicating that they would reduce services or withdraw from Medi-Cal following rate reductions, it was reasonable for CMS to credit the State's analysis over those self-serving survey responses.[17]

## CONCLUSION

The motion for a preliminary injunction should be denied.[18]

---

[17] Finally, Plaintiffs also suggest that CMS's approval of SPA 11-009 was improper because the State enacted AB 97 "for solely budgetary reasons." Pls.' Mem. at 21-22. Even assuming that California's motivations were solely budgetary, the record reflects that CMS reviewed the State's submission of SPA 11-009 to determine whether it satisfied the requirements of Section 30(A). Thus, the motivation of the California legislature in enacting AB 97 is irrelevant so long as the criteria of Section 30(A) are satisfied, as CMS determined they were.

[18] The Court has already found, in similar cases, that Plaintiffs can show irreparable harm and that the balance of equities tips in their favor. The Government will not reiterate its arguments, and instead refer to the Court to our earlier briefs. *See, e.g., California Hospital Ass'n*, ECF No. 47 at 30-31. We do, however, respectfully disagree with the Court's ruling on those issues, *see, e.g., CMTA*, Order Granting Prelim. Inj. at 19-21, and note that under the Court's analysis, irreparable harm would inevitably be met any time rates are reduced, even if providers were to suffer a single dollar of monetary loss. Additionally, with respect to the balance of equities, we maintain that Plaintiffs have made no actual showing that access or quality problems will result from the rate reductions.

DATED:  January 17, 2012

Respectfully submitted,

TONY WEST
Assistant Attorney General

ANDRÉ BIROTTE JR.
United States Attorney
Central District of California

SHEILA LIEBER
Deputy Director

s/ *Benjamin L. Berwick*
BENJAMIN L. BERWICK
TAMRA T. MOORE
ETHAN P. DAVIS
E-Mail: Benjamin.L.Berwick@usdoj.gov
Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20001
Phone: (202) 305-8573
Fax: (202) 616-8470

*Attorneys for Defendant Sebelius*

26