TONY WEST
Assistant Attorney General

ANDRE BIROTTE JR.
United States Attorney
Central District of California

SHEILA M. LIEBER
Deputy Director

BENJAMIN L. BERWICK
E-Mail: Benjamin.L.Berwick@usdoj.gov
Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
20 Massachusetts Ave. NW
Washington, D.C. 20530
Telephone: (202) 305-8573
Facsimile: (202) 616-8470

*Attorneys for Defendant Kathleen Sebelius*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| CALIFORNIA MEDICAL ASSOCIATION, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>TOBY DOUGLAS, et al.,<br><br>Defendants. | Case No. CV 11-9688-CAS (MAN)<br><br>**DECLARATION OF KRISTIN FAN**<br><br>Date: January 30, 2012<br>Time: 10:00 a.m.<br>Courtroom No. 5<br><br>Trial Date: None set |

1

# DECLARATION OF KRISTIN FAN

I, Kristin Fan, declare as follows:

1. I am the Deputy Director of the Financial Management Group, an office within the Center for Medicaid and CHIP Services, Centers for Medicare & Medicaid Services, United States Department of Health and Human Services.

2. I am knowledgeable about the review process CMS undertook with respect to approving State Plan Amendment (SPA) 11-009 given my direct involvement in the review process and through briefings conducted with my staff.

3. CMS's review of SPA 11-009 focused on payment methodology and access to services. In addition CMS does not review cost reports when reviewing rates. Indeed, there are only a finite number of services with standardized cost reports (hospitals, nursing homes using Medicare cost reports) and for the vast majority of non-institutional services covered under Medicaid, there are no available cost reports or standards by which to evaluate the accurateness of such reports.

4. Rather than relying on cost data for each service, CMS asked California to provide analyses to demonstrate that beneficiaries currently have adequate access to care and that with the proposed rate reductions they would be able to obtain adequate access to care if the proposed rate reductions were approved. CMS also asked California to develop an ongoing monitoring tool to evaluate access to care on an ongoing basis. CMS relied on

access focused analysis because CMS believes that Section (a)(30)(A) is satisfied as long as beneficiaries may obtain access to care and services "at least to the extent that such care and services are available to the general population in the geographic area" whether or not providers are fully compensated for the costs of providing services. Accordingly, the agency worked with California to identify data elements in order to document whether the state had met those standards in reference to each service affected by SPA 11-009. As part of the access analysis, CMS did consider data related to service utilization and provider availability capacity to attempt to determine whether, after the rate cuts, sufficient capacity would be retained within the existing network of providers to meet the current demand for services.

5. In reviewing SPA 11-009, CMS considered many studies and other data submitted by third parties, including, but not limited to the studies listed below. CMS used this information to guide its discussions with the state about the proposed rate cuts during weekly meetings and to help articulate the specific questions it posed to California. The third party information, however, was often inferior to the data provided by the state because it was general or contained data that was not specific to California. In addition, many of the studies did not take into account the fact that many Medi-Cal beneficiaries receive their services through FQHCs/RHCs, which were not subject to the rate reduction.

    a.    Study entitled "Health Spending by State of Residence, 1991-2009" (published in

Medicare & Medicaid Research Review, 2011: Volume 1, Number 4) [ECF No. 88-1, Ex. 7]. CMS used this study to provide general background information, which helped the agency formulate the questions it posed to California. The study itself, however, does not include specific information related to California that would suggest an access issue for any specific service. The study is not service specific, does not provide service specific rate comparisons, and does not address state-specific beneficiary impacts. Rather, the study looks at per capita spending for all payers, Medicare and then Medicaid. While California is cited as being one of the bottom ten states in per capita Medicaid spending, California is likewise ranked in the bottom when it comes to overall per capita spending, suggesting that Medicaid rates simply reflect overall payment rates. The study also indicates that populations in western regions tend to be younger. Therefore, one would expect populations in western states, like California, to be healthier and thus have lower overall health care expenditures.

  b. Survey commissioned by the California Medical Association (CMA), the California Hospital Association (CHA), and the California Association of Health Plans [ECF No. 120-1, Ex. 2]. On October 11, 2011, CMA and representatives from Fairbank, Maslin, Maullin, Metz & Associates presented the survey results to CMS. The survey contained three sections: 1) Health Status and Use of Health System, 2) Perceptions of the Health Care System and Access to Care, 3) Impact of Fees on Behavior of Medi-Cal Patients. The survey was conducted over a nine

4

day period and only involved 763 California residents (363 Medi-Cal beneficiaries).

    i.    In reviewing SPA 11-09, CMS had to make determinations regarding rates for specific services and what impact, if any, a rate cut would have on access to those services under the fee-for-service (FFS) delivery system. While the survey provided interesting insight into beneficiary perceptions and provided context for discussions with California, CMS was cognizant of several shortcomings within the survey as it related to determining access to the specific services under review in the SPA. The following shortcomings were discussed by CMS staff during the October 11, 2011 presentation.

    ii.    The survey did not differentiate between the Medicaid managed care delivery systems and the FFS system. 54% of Medi-Cal beneficiaries are in managed care and their access was not relevant to the review of the SPA.

    iii.    The first two sections of the survey did not focus specifically on access to services, but instead focused on each individual's general impressions about health and the health care system.

    iv.    The survey did not take into consideration the populations covered by Medi-Cal. Roughly 33% of the Medi-Cal population is composed of undocumented individuals only entitled to emergency services under

        Federal law. Of the remaining Medi-Cal population, nearly half are in an aid category of: aged, blind or disabled, foster care or other. The remaining enrollees are in the category of families and children. The survey did not control for the differences that are likely to exist between the health status and needs of these groups.

    v.    With respect to the information on ER utilization in lieu of physician office visits, CMS compared the survey results against trended statistical analysis of adult utilization of physician and clinic visits. California's data, trended over the three year period of 2007-2009, indicated a steady number of Medi-Cal adult office visits (82%), which was above the annual number of adult visits in the nation as reported in the 2009 Health Interview Survey (80%).

c.    June 8, 2009 letter from CMA to Secretary Sebelius [ECF No. 99-1, Ex. 3]. CMS reviewed this letter, which is specifically related to SPA 08-009B1, and met with CMA on August 3, 2011 to discuss its concerns. As a result of that meeting, CMA attempted to conduct a more up-to-date survey which is discussed in section b. above.

d.    May 2, 2011 letter from the Alliance for Patient Care to Secretary Sebelius [ECF No. 99-1, Ex. 7]. CMS considered this letter and presented the information to California. The state, however, was able to provide its own analysis

6

demonstrating the number of physicians and other primary care providers available to serve Medi-Cal patients with the rate cuts.

e. May 9, 2011 letter from the California Association of Health Plans to Secretary Sebelius [ECF No. 99-1, Ex. 8]. CMS considered this letter, however, it primarily focused on the impact on managed care, which is not governed by 1902(a)(30)(A). In addition, the letter did not provide specific examples of impacts on beneficiary access.

f. Various letters from other provider groups [ECF No. 99-1, Ex. 9]. CMS considered these letters, but they contained general complaints and did not provide specific examples of beneficiary impact.

g. July 2009 South Dakota study regarding the relationship between Medicaid Reimbursement and provider participation [ECF No. 99-2, Ex. 10]. CMS does not believe this report is relevant to SPA 11-009. The report is about South Dakota and, although it includes general comments about national provider participation in Medicaid, it does not address any specific access issues or beneficiary impacts in California.

h. June 2004 article in Health Affairs entitled "Trends: Changes in Medicaid Physician Fees, 1998-2003: Implications for Physician Participation" [ECF No.

7

99-2, Ex. 11]. CMS reviewed this article; however, the article relied on old data from 1998-2003. Rather than rely on old data, CMS looked at its own more recent data and pulled 2009 information from the State's Medicare Management Information System (MMIS) data. CMS reviewed 20 Medicaid physician base fee schedule rates by procedure codes to see how California compared to seven other States (FL, NV, OR, PA, TX, WA and VA). Except for one code, California did not have the lowest rate.

    i.    July 2010 study entitled "Physician Participation in Medi-Cal, 2008" [ECF No. 111-2, Ex. 14]. CMS reviewed this study, but the study does not rely on Medi-Cal claims data and instead relies on physician self-reporting regarding Medi-Cal participation. CMS used this study to develop questions for California. The state pulled data from its paid claims database to determine active providers and showed that physician levels have been fairly steady over the past few years with some slight increases. California's data analysis showed that population to provider ratios met HRSA thresholds. The analysis also identified other locations where Medi-Cal beneficiaries receive services. For example, there is a heavy reliance on FQHCs/RHCs in the State which were not subject to the rate reduction.

    j.    June 2001 article in Pediatrics entitled "Access to Orthopedic Care for Children with Medicaid Versus Private Insurance in California [ECF No. 111-2, Ex. 15]. CMS reviewed this article, but notes that the data discussed was gathered prior to

2001. Furthermore, the letter is not relevant to the approved SPA because California removed the rate reductions for physician services to children.

k. June 9, 2011 letter from Six Rivers Planned Parenthood to Administrator Berwick [ECF No. 111-3, Ex. 20]. CMS reviewed this letter, but it only contains general allegations of potential impact and does not provide a comparison to commercial rates.

l. July 5, 2011 letter from CMA to Administrator Berwick commenting on proposed rule [ECF No. 111-3, Ex. 23]. CMS did not specifically review this letter because the rule making process and the SPA review process are completely separate. However, to the extent that the information specific to California was presented in other CMA letters then the information was considered.

m. April 2009 study entitled "Medi-Cal Physician and Dentist Fees: A Comparison to Other Medicaid Programs and Medicare" [ECF No. 117-3, Ex. 32]. CMS reviewed this study, but it provides a comparison of California Medicaid rates and does not specifically address actual beneficiary impact. The report indicates that persistently low rates could deter physician participation; however, California was able to present actual data that contradicted this prediction. In addition, CMS looked at California's monitoring plan, by which California will track provider participation rates on an ongoing basis to ensure provider participation is

adequate.

n. June 2009 study entitled "Fewer and More Specialized: A New Assessment of Physician Supply in California" [ECF No. 121-1, Ex. 33]. CMS reviewed this study; however, the report did not focus on Medi-Cal beneficiaries and any lack of access to medical services. The report focused on California physicians delivering services to the California population as a whole and indicated that, in general, the number of primary care physicians practicing in the State is at or below estimated needs.

o. October 2006 study entitled "Emergency Department Utilization in California: Survey of Consumer Data and Physician Data [ECF No. 121-2, Ex. 34]. CMS reviewed this study, but it does not provide usable data broken out between Medi-Cal and other payers. The study also focused on the adequacy of emergency room rates or physician rates in relation to a lack of access to preventive and immediate care. The study also generally addresses the total California population, rather than focusing specifically on the Medi-Cal population. Furthermore, while the report references the lack of access to preventive care as a contributing factor to increased Emergency Department visits, it also references the lack of advice or information about managing immediate health care needs, lack of alternatives to the Emergency Department for immediate needs, and the prevalence of attitudes that foster the use of the Emergency Department for non-urgent care.

p.  May 2003 study entitled "Physician Participation in Medi-Cal, 2001" [ECF No. 122-2, Ex. 38]. CMS considered this study, but found the data to be significantly outdated. While the report indicated a lower physician participation rate in the Medi-Cal program, it also referenced efforts in the late 1990s to increase physician fees and the fact that there was no "measurable increase in physicians' participation in the program between 1996 and 2001." The report does not identify a beneficiary access issue and also acknowledges that there are other factors besides rates that impact provider participation. Finally, as part of its access analysis, California utilized its MMIS data to pull the actual number of physicians submitting claims, which showed that there was not in fact a current access issue.

q.  Documentation from EMT providers on the cost and availability of EMT in California, including reports from the GAO and the Institute of Medicine stating that Medi-Cal rates cover only one-quarter of the cost providing EMT. CMS reviewed these reports and also met with several members of the California Ambulance Association on June 27, 2011. The Association provided CMS with additional information regarding comparative studies that show that the Medi-Cal rate is approximately 14% of commercial rates, 35% of Medicare rates, and only 14% of cost. Both Medicaid and Medicare reimbursed below the California providers cost of providing the service. However, California was able to secure

ambulance services at the proposed level of rates, i.e. ambulance providers would transport Medi-Cal beneficiaries at the rates paid; therefore, access was at the same level of the general population in the geographic area. If any of the Counties, the entities responsible for contracting for emergency medical services in California, were unable to secure emergency service providers because of Medi-Cal reimbursement levels, access would then be an issue. The Association acknowledged the unique juxtaposition of access and rates for services in this particular case in California. CMS also considered the fact that utilization and the number of emergency transportation providers increased despite the rate cuts.

    r.    Comments from DME providers indicating that 49 percent of their revenue goes to purchasing equipment, 46 percent of revenue goes to operating costs and 5 percent goes to profit and survey results from DME providers who indicated that, if the rate cuts went into effect, 42.1 percent would severely reduce products and services, and 10.5 percent would stop providing DME to beneficiaries. CMS did consider this information; however, California's data showed that the 2008 reductions did not cause any access issues. In addition, the data from the State's Medicaid Management Information System provided a more accurate illustration of access. CMS does not currently have any indication that the reductions to Medical Supplies and Equipment has resulted in a negative impact on access and CMS will continue to engage the State to ensure that access will be adequately

monitored as an ongoing concern.

6. CMS consistently found the data presented by California to be more persuasive than the information submitted by third parties for several reasons, including, but not limited to the following:

   a. California pulled its data from its administrative data sources including its Medi-Cal paid claims database. This information is submitted to CMS as part of MMIS data and is also used by the State to support expenditures for Federal matching purposes on the CMS-64. CMS would have no reason to believe that the data would be erroneous and the agency has received no specific information as to how the information the state presented is flawed.

   b. The statutory requirement is that, "… care and services are available [to Medi-Cal beneficiaries] at least to the extent that such care and services are available to the general population in the geographic area."

      i. The State was not able to obtain and CMS does not have data to make a comparison between the Medicaid population and commercial payers as utilization data for commercial payers was not readily available. Instead, the State primarily analyzed data which illustrated utilization patterns resulting from implementation of the State Fiscal Year (SFY) 2008 reductions. This analysis included data applicable to SFYs 2008, 2009

and 2010. As some of the SFY 2008 reductions had been implemented, CMS was able to study the correlation between the reductions and the trends in the utilization and found that the 2008 reductions did not cause an access problem. Emergency Medical Transportation providers, however, were able to provide utilization data across payer types as they render services to both the general public and Medicaid beneficiaries. CMS also considered this set of data in evaluating the State's proposal to reduce rates.

ii. CMS allowed the State to determine the geographic areas within California to the extent that those determinations included a description of how they were determined and included at least a differentiation between urban and non-urban areas. The distinction between rural and urban is standard in analyses regarding physician supply and distribution. Where providers indicating concern about services in isolated areas, CMS asked the State to address those specific inquiries. Of note, CMS met with members of the California Hospital Association concerned about the impact of cuts on distinct part, sub-acute services in remote locales (an island with limited providers and a remote, rural location with limited providers). The State withdrew its request for rate cuts with respect to these situations.

c. During the review process, CMS consistently asked California to address concerns raised by third parties or to provide additional information supporting the rate cuts. For example:

   i. California was able to describe the actual service settings for its beneficiaries and could reference the high utilization of FQHC services as a source of primary care. In addition, the State was able to benchmark its physician visit information to national standards. In those instances where it was evident that service rates were below averages, the State withdrew the proposed rate reduction (physician services for children).

   ii. When specific rate issues were raised, CMS asked the State to do further data analysis to understand the situation. For example, the California Medical Association would cite that a particular billing code was $12 and with the rate cut the rate would be $11. The State utilized its paid claims data to indicate that this "particular code only accounts for 4% of visits billed, the vast majority of visits are billed at fee rates that are at least double." And when one analyzed the "entire dollar amount paid for claims associated with those visits, including other procedures billed in addition to the $12 fee, the average amount per visit for claims with that code in 2009 was $64.99."

d. With respect to dental services, California looked at data from the National Committee of Quality Assurance (NCQA) to determine the percentage of children with health insurance for 11 months out of the year who had at least one dental

visit per year. CMS understands that California looked at the same metric in its access analysis (using fee-for-service data) to show that approximately the same number of Medi-Cal patients, aged 0-20, had at least one dental visit per year. Thus, it was reasonable for CMS to conclude that Medi-Cal offered approximately the same level of access to dental services as managed care plans offered to children nationwide. Data submitted to CMS by States prior to 2010 showed utilization ratios based upon the number of children who had at least one dental visit within a year over the total number of children enrolled in Medicaid within that year, even if they had been enrolled for only one month.

7. CMS also reviewed California's fee schedule before approving SPA 11-009.

8. I also certify that, to the best of my knowledge:

   a. Exhibit A to this certification constitutes a true and complete copy of the October 1, 2010 CMS Letter to State Medicaid Directors re: Revised State Plan Amendment Review Process.

   b. Exhibit B to this certification constitutes a true and complete copy of the September 28, 2011 letter to Gloria Nagle from Toby Douglas re: Response to March 4, 2011, RAI and August 9, 2011, additional questions on SPA 10-24.

Date: January 17, 2011

_____
KRISTIN FAN

17