O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CALIFORNIA MEDICAL ASSOCIATION; et al,                )          Case No. CV 11-9688 CAS (MANx)
                                                       )
                       Plaintiffs,                     )          **ORDER GRANTING**
                                                       )          **PRELIMINARY INJUNCTION**
vs.                                                    )
                                                       )
                                                       )
TOBY DOUGLAS; et al.;                                  )
                                                       )
                       Defendants.                     )
_____

## I.      INTRODUCTION AND BACKGROUND

On November 21, 2011, plaintiffs California Medical Association, Inc. ("CMA"), et al. filed the instant action against Toby Douglas, Director of the California Department of Health Care Services (the "Director") and Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services (the "Secretary").  Plaintiffs filed their First Amended Complaint ("FAC") on December 30, 2011.

The California Department of Health Care Services ("DHCS") is a California agency charged with the administration of California's Medicaid program, Medi-Cal. The Secretary is responsible for administering the Medicaid program at the federal level. Through her designated agent, the Centers for Medicare and Medicaid Services

("CMS"), the Secretary is responsible for reviewing and approving policy changes that states make to their Medicaid programs.

Plaintiff CMA is a professional association representing the interests of physicians in California. Plaintiff California Dental Association ("CDA") is a professional association representing the interests of dentists in California. Plaintiff California Pharmacists Association ("CPhA") is a professional association representing the interests of California pharmacists.[1] Plaintiff National Association of Chain Drug Stores ("NACDS") is a national association whose members include 18 national pharmacy chains in California with over 3,100 individual pharmacies throughout the State. Plaintiff California Association of Medical Product Suppliers ("CAMPS") is a trade organization representing the interests of durable medical equipment ("DME") suppliers in California.[2] Plaintiff AIDS Healthcare Foundation ("AHF") is the largest provider of medical care for AIDS patients in California. Plaintiff American Medical Response West ("AMR") provides emergency medical transportation ("EMT") services in California. Plaintiff Jennifer Arnold is an individual whose infant son is a Med-Cal

---

[1] The Director argues that the present action is redundant and that Plaintiffs cannot establish irreparable harm as to pharmacy services in light of this Court's prior ruling in Managed Pharmacy Care v. Sebelius, CV No. 11-09211, (C.D. Cal. Dec. 28, 2011), enjoining enforcement of the rate reduction with respect to pharmacy providers. The Court finds this argument unavailing because the issuance of a preliminary injunction in an overlapping case does not operate to moot a parallel action because the original order is "subject to reopening." See, e.g., Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 n.7 (2005); 13B Wright et al., Federal Practice and Procedure § 3533.2.1, 832 (3d ed. 2008) ("mootness may be denied because the decision is subject to reopening or appeal"). In this case, the Director has already filed an appeal of the preliminary injunction this Court issued in the Managed Pharmacy Care. Further, plaintiffs in this case present different legal theories and new developments that were not presented in Managed Pharmacy Care.

[2] The Court refers to CMA, CMDA, CPhA, NACDS, and CAMPS collectively as the "associational plaintiffs."

beneficiary.  Plaintiffs Does 1 through 25 are individuals residing in California that receive outpatient services through the Medi-Cal program.

On March 25, 2011, California Governor Edmund G. Brown Jr. signed into law Assembly Bill 97 ("AB 97"), the health budget trailer bill for California fiscal year 2011–2012.  AB 97 enacted significant payment reductions for many classes of services provided under the Medi-Cal program.  Most significantly for the purposes of the instant action, AB 97 enacted California Welfare and Institutions Code § 14105.192, which authorizes the Director to reduce the Medi-Cal payment rates for various services, including physician, clinic, dental, pharmaceutical, EMT and DME and medical supply services, effective June 1, 2011.  Pursuant to Welfare and Institutions Code § 14105.192(n), the Director is required to seek any federal approvals necessary prior to implementing the rate reduction.

DHCS submitted proposed State Plan Amendment ("SPA") 11-009 to CMS on June 30, 2011, seeking federal approval of the rate reduction and incorporation of that reduction into California's Medi-Cal State Plan.  On September 27, 2011, CMS issued a letter to DHCS requesting additional information concerning the proposed rate reduction.  This Request for Additional Information ("RAI") focused on the impact of the rate reduction on access to services.  DHCS responded with analyses of the rate reduction's impact on access and a plan for monitoring access.  On October 27, 2011, in a letter from the Associate Regional Administrator of the Division of Medicaid & Children's Health Operations, CMS provided notice to the Director and DHCS that it had approved the SPA.  Contemporaneously with the approval letter, the Associate Regional Administrator also sent a "companion letter" by which CMS gave notice to the Director and DHCS that it had "identified additional issues" that were "not in compliance with current regulations, statute, and CMS guidance."

/ / /

/ / /

/ / /

Plaintiffs allege that CMS' approval of the SPA was in violation of 42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)"),[3] the Supremacy Clause,[4] FAC ¶¶ 70–72, and the Due Process Clause of the 14th Amendment to the U.S. Constitution.[5] Id. ¶¶ 73–79. Plaintiffs further allege that the Secretary's approval of the SPA violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. because the Secretary failed to appropriately consider certain factors including the impact of the rate reduction on access to and quality of medical services. Id. ¶¶ 66–69.

On December 30, 2011, plaintiffs filed the instant motion seeking a preliminary injunction restraining the Director from implementing the rate reduction. On January 17, 2011, the Director and the Secretary filed separate oppositions to plaintiffs' motion. Plaintiffs replied on January 23, 2011. A hearing was held January 30, 2011. After carefully considering the parties' arguments, the Court find and concludes as follows.

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 9 (2008). The Ninth Circuit summarized the Supreme Court's recent clarification of the standard for granting preliminary injunctions in Winter as follows: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is

---

[3] Section 30(A) states in pertinent part that a State plan for medical assistance must:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

[4] U.S. Const. art. VI, cl. 2.

[5] U.S. Const. amend. XIV.

in the public interest." <u>Am. Trucking Ass'n, Inc. v. City of Los Angeles</u>, 559 F.3d 1046,
1052 (9th Cir. 2009); <u>see also</u> <u>Cal. Pharms. Ass'n v. Maxwell-Jolly</u>, 563 F.3d 847, 849
(9th Cir. 2009) ("<u>Cal. Pharms. I</u>").  Alternatively, "'serious questions going to the
merits' and a hardship balance that tips sharply towards the plaintiff can support
issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable
injury and that the injunction is in the public interest." <u>Alliance for the Wild Rockies v.
Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011); <u>see also</u> <u>Indep. Living Ctr. of So. Cal. v.
Maxwell-Jolly</u>, 572 F. 3d 644, 657–58 (9th Cir. 2009) ("<u>ILC II</u>").  A "serious question"
is one on which the movant "has a fair chance of success on the merits." <u>Sierra On-Line,
Inc. v. Phoenix Software, Inc.</u>, 739 F.2d 1415, 1421 (9th Cir. 1984).

## III.    DISCUSSION

### A.    Standing

Before turning to the merits of plaintiffs' motion, the Court first addresses the
Director's arguments that plaintiffs lack standing to bring this case.

#### 1.    Concrete Injury

The Director argues that plaintiffs have not alleged an "actual and imminent
injury" because plaintiffs' alleged injury relies on a "tenuous thread of assumptions
contingent upon possibilities."  Director's Opp'n at 13.

The Court rejects this argument because plaintiffs' alleged injuries are concrete
rather than speculative or conjectural.  In order to establish standing to assert a claim, a
plaintiff must: (1) demonstrate an injury in fact, which is concrete, distinct and palpable,
and actual or imminent; (2) establish a causal connection between the injury and the
conduct complained of; and (3) show a substantial likelihood that the requested relief
will remedy the alleged injury in fact.  <u>See</u> <u>McConnell v. Fed'l Election Comm'n</u>, 540
U.S. 93, 225-26 (2003).  In this case, plaintiffs allege that if implemented, the challenged
rate reduction would inflict concrete financial injury on Medi-Cal participating service
providers.  <u>See</u> <u>Indep. Living Ctr. of So. Cal. v. Shewry</u>, 543 F. 3d 1050, 1065 (9th Cir.

2008) ("ILC I").  ILC I also establishes that Medi-Cal beneficiaries have standing to challenge a Medi-Cal rate reduction when they allege they will by "'put at risk of injury by implementation of the . . . payment cuts' because those cuts will reduce . . . access to quality services."  Id.  Accordingly, plaintiffs have Article III standing.

### 2.   Prudential Standing

The Director argues that plaintiffs' lack prudential standing to enforce Section 30(A) because plaintiffs seek to enforce rights belonging to a third party, CMS.  According to the Director, this Section does not confer individual entitlements on any private parties, but instead serves as a "yardstick" by which the federal government may assess a state's performance under the Medicaid Act.  Director's Opp'n at 14.  Moreover, to the extent that plaintiffs' claims rely on the Supremacy Clause, the Director argues that they run afoul of the bar against considering generalized grievances in that plaintiffs are not attempting to vindicate any right personal to them, but instead invoke the Supremacy Clause as an "all-purpose cause of action to compel a state's compliance with federal law."  Id. at 15 (citing Valley Forge Christian Coll. v. Amer. United for Sep. of Church and State, 454 U.S. 464, 483 (1982)).

The Court finds the Director's prudential standing arguments unavailing.  In assessing prudential standing, a court need not "inquire whether there has been a congressional intent to benefit the would-be plaintiff," but instead must determine only whether the plaintiff's interests are among those "arguably . . . to be protected" by the statutory provision.  Nat'l Credit Union v. First Nat'l Bank & Trust Co., 552 U.S. 478, 489 (1998).  This "zone of interest" test "is not meant to be demanding."  Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 399–400 (1987).  To this end, Section 30(A) establishes standards by which payments to providers are set.  Accordingly, Medi-Cal beneficiaries and providers are undoubtedly within the zone of interests protected by Section 30(A).  Further, the Court finds that contrary to the Director's assertion, plaintiffs are not alleging a "generalized grievance."  This is so because plaintiffs have alleged that the

associational plaintiffs' members and Medi-Cal beneficiaries will be directly harmed by the implementation of the rate reduction.

### 3.   Associational Standing

The Director maintains that the associational plaintiffs cannot establish associational standing on behalf of providers because any injury suffered by a provider will be particular to that provider.  Director's Opp'n at 16.  The Director further contends that the associational plaintiffs and AHF do not have standing on behalf of Medi-Cal beneficiaries because the associational plaintiffs and AHF do not represent beneficiaries' interest, because the associational plaintiffs and AHF fail to allege how representing Medi-Cal recipients' interests is germane to their purposes, and because whether an individual beneficiary has a legitimate claim will require an individualized determination.  Id. at 16–17.

The Director's associational standing arguments also fail.  An association has standing to sue on behalf of its members if (1) they would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) participation by the individual members is not necessary to resolve the claim. Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343 (1997).  The Ninth Circuit has recognized that when an association is pursuing an action for only declaratory and injunctive relief on behalf of its members, participation in the action by individual members is not required.  See Associated Gen'l Contractors of Am. v. Metropolitan Water Dist. of So. Cal., 159 F. 3d 1178, 1181 (9th Cir. 1998).  Here, plaintiffs are not seeking monetary relief, so participation of individual Medi-Cal providers is not required.  Next, other courts have held that because individual medical providers would have third-party standing to represent the interests of their patients, associations representing those providers can also represent the interests of patients. See, e.g., Penn. Psychiatric Soc'y v. Green Spring Health Srvs., Inc., 280 F. 3d 278, 288–94 (3d Cir. 2002); New Jersey Protection & Advocacy v. New Jersey Dep't of Educ., 563 F. Supp. 2d 474, 481–84 (D.N.J 2008).  Accordingly, in this case, the

associational plaintiffs' members would have standing to represent the interests of their Medi-Cal patients and therefore the associational plaintiffs have standing to do the same. More fundamentally, even if the associational plaintiffs did not have standing to represent Medi-Cal beneficiaries, it would not alter the Court's ability to reach the merits of the controversy because an individual Medi-Cal beneficiary whose standing is not challenged is a plaintiff in this case.

Having rejected each of the Director's standing arguments, the Court now turns to the merits of plaintiffs' motion.

**B.      Likelihood of Success on the Merits**

**1.      Plaintiffs' Section 30(A) Claim Against the Secretary**

Plaintiffs argue that they are likely to succeed on the merits of their Section 30(A) claim against the Secretary because CMS failed to apply controlling law in evaluating SPA 11-009 and therefore acted arbitrarily and capriciously.

Under the APA, a reviewing court must affirm an agency's determination unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" O'Keefe's, Inc. v. U.S. Consumer Prod. Safety Comm'n, 92 F. 3d 940, 942 (9th Cir. 1996) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

If a statute is silent or ambiguous with respect to a specific question, the issue for the court is whether the agency's answer is based on a permissible construction of the statute. Chevron U.S.A. v. NRDC, 467 U.S. 837, 842–43 (1984). Chevron deference is required "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming

deference was promulgated in the exercise of that authority." United States v. Mead
Corp., 533 U.S. 218, 226–27 (2001).

### a.   CMS' Companion Letter

As an initial matter, plaintiffs argue that CMS' approval was "internally
inconsistent" and therefore arbitrary and capricious because CMS "conceded" in its
companion letter that it did not have a comprehensive plan from which it could
determine if SPA 11-009 complied with federal law.

42 C.F.R. § 430.10 requires that a State plan be a comprehensive written statement
containing all information necessary for CMS to determine whether the plan can be
approved.  CMS' companion letter to the letter approving SPA 11-009 acknowledged
that CMS "reviews SPAs in the context of the overall state Plan for consistency with the
requirements of section 1902(a) of the Social Security Act."  The letter states:

> Section 1902(a)(30)(A) of the Social Security Act (the Act) requires the
> procedures related to payments include a comprehensive description of the
> methods and standards used to set payment rates.  Attachment 4.19-B illustrates
> how non-institutional providers will be reimbursed and must contain
> comprehensive State plan language. . . .  In addition, since the State plan is the
> basis for Federal financial participation, it is important that payment
> methodologies documented in the State plan are understandable and auditable.
> Absent the descriptions of these criteria, CMS will not be able to determine that
> the State plan language meets the requirements set forth in 42 CFR 447.252(b), 42
> CFR 447.10, and Section 1902(a)(30)(A) of the Act.

According to plaintiffs, the companion letter "provides CMS' own admission"
that when CMS approved SPA 11-009, the resulting State Plan did not comply with
various federal Medicaid requirements.  Mot. at 10–11.  Plaintiffs argue that CMS'
inquiry "indicates that at the time CMS approved SPA 11-009, CMS did not know what
California's current reimbursement rates actually were." Id. at 11.  Therefore, plaintiffs
argue that CMS could not determine whether the resulting rates complied with Section

9

30(A), and that such "internally contradictory agency reasoning" renders the approval of SPA 11-009 "arbitrary and capricious."  Id. (citing Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife, 273 F.3d 1229, 1236 (9th Cir. 2001)).

In opposition, the Secretary argues that CMS issued the companion letter to begin a separate process to resolve "peripheral issues" with the State Plan, and not to address problems with SPA 11-009.  Thus, the Secretary contends that the companion letter does not reflect any inconsistency in CMS' position, but instead merely shows that CMS determined that tangential technical matters should not delay the approval of an acceptable SPA.  Secretary's Opp'n at 12–13.

The Court agrees with the Secretary that plaintiffs' argument fails because it rests on an improper understanding of the process CMS uses to review SPAs.  Rather than show an "internal inconsistency," the companion letter is merely part of CMS' process by which it reviews the specific proposed amendment and evaluates whether it complies with the Medicaid Act and separately determines whether other parts of a state plan, not at issue in the proposed SPA, may need to be revised to comply with statutory requirements.  See State Medicaid Director Letter No. 10-020, October 1, 2010 (attached to Secretary's Opp'n as Exhibit A).  Under its process for reviewing SPAs, even if it discovers peripheral issues in a state plan that need to be addressed, CMS will not refrain from approving an SPA it deems acceptable.  In this case, the companion letter explains that the State Plan is inadequate because it fails to comprehensively explain certain rates in a way that third parties and auditors would understand.  The Court does not believe that the companion letter reflects a determination by CMS that changes to those rates are inconsistent with Section 30(A).

### b. Cost Studies

Plaintiffs contend that CMS' approval of SPA 11-009 was arbitrary and capricious because CMS failed to consider whether DHCS relied on credible cost studies and developed rates reasonably related to provider costs as the Ninth Circuit has held is required under Section 30(A).  Mot. at 11 (citing Orthopaedic Hosp. v. Belshe, 103 F. 3d

1491, 1492, 1496, 1500 (9th Cir. 1997) cert. denied, Belshe v. Orthopaedic Hosp., 522
U.S. 1044 (1998)).

In opposition, the Secretary contends that CMS' contrary interpretation of Section
30(A), upon which it based its approval of SPA 11-009, is entitled to Chevron deference
notwithstanding the Ninth Circuit's decision in Orthopaedic Hospital that a state must
consider "responsible cost studies."

Although Section 30(A) leaves room for interpretation,[6] the Court does not
believe the agency's interpretation is owed Chevron deference with respect to the
approval at issue in this case.  In this respect, the Court finds significant that the
Secretary's approval of SPA 11-009 did not involve a formal adjudication accompanied
by the procedural safeguards justifying Chevron deference.  Instead, the Secretary's
issued her interpretation of Section 30(A) in a letter to DHCS.  This kind of
interpretation is of the very type for which the Supreme Court has declined to extend
Chevron deference.  See e.g., Christensen v. Harris County, 529 U.S. 576, 586–88
(2000) (holding that informal agency interpretations of a statute such as those contained
in an opinion letter, policy statement, agency manuals, or enforcement guidelines, are
not entitled to Chevron-style deference).  Alaska Dept. of Health and Social Servs. v.
CMS, 424 F.3d 931 (9th Cir. 2005), upon which the Secretary relies, is inapposite.  In
Alaska, the Ninth Circuit deferred to the Secretary's interpretation of Section 30(A) and
upheld the denial of a State Plan Amendment.  In finding that the CMS Administrator's
final determination "carr[ied] the force of law" necessary for Chevron deference, the
court highlighted "the formal administrative process afforded the State," with

---

[6] The Court notes that Section 30(A) does not explicitly mention provider costs or
cost studies and that three other circuit courts have determined that CMS need not consider
provider costs in deciding whether or not to approve a State Plan Amendment.  See Rite
Aid of Pa. Inc. v. Houstoun, 171 F.3d 842, 853 (3d Cir. 1999); Methodist Hosps., Inc. v.
Sullivan, 91 F.3d 1026, 1030 (7th Cir. 1996); Minn. Homecare Ass'n v. Gomez, 108 F.
3d 917, 918 (8th Cir. 1997) (per curiam).

"opportunities to petition for reconsideration, brief its legal arguments, be heard at a formal hearing, receive reasoned decisions at multiple levels of review and submit exceptions to those decision." <u>Alaska</u>, 424 F. 3d at 939.  None of these procedural safeguards was incorporated in the SPA approval process at issue in this case, in which there was no hearing, no record, no opportunity for interested parties to present evidence, and no formal decision in which the Secretary set forth her reasoning.[7] Accordingly, the Secretary's approval of SPA 11-009 did not include the "hallmarks of 'fairness and deliberation,'" to which <u>Chevron</u> deference is owed.  <u>See</u> <u>Alaska</u>, 424 F. 3d at 939 (quoting <u>Mead</u>, 533 U.S. at 226–27).[8]

---

[7] 42 U.S.C. § 1316(a), which governs CMS' consideration of State Plan Amendments, does not require any type of hearing when the Secretary approves a State Plan Amendment.  42 U.S.C. § 1316(a)(1).  In contrast, where the Secretary rejects a State's proposed Amendment, the State is entitled to petition the Secretary for reconsideration of the issue, and the Secretary is required to hold a hearing.  42 U.S.C. § 1316(a)(2).  For this reason, <u>Chevron</u> deference is more appropriate for the disapproval of a State Plan Amendment.

[8] The Secretary's reliance on <u>Dickson v. Hood</u>, 391 F. 3d 581 (5th Cir. 2004), and <u>Harris v. Olszewski</u>, 442 F. 3d 456 (6th Cir. 2006), is similarly misplaced.  In <u>Dickson</u>, a Medicaid recipient alleged that the Louisiana Department of Health and Hospitals violated his federal rights by refusing to pay for medically prescribed disposable incontinence underwear.  <u>Id.</u> at 584.  The court merely afforded deference to the Secretary's interpretation of "home health care services" as embodied in a regulation previously promulgated pursuant to formal notice-and-comment rulemaking.  <u>Id.</u> at 594.  <u>Harris</u> involved a challenge to Michigan's single source provider contract for incontinence supplies as violating the Medicaid Act's freedom of choice provisions.  442 F. 3d at 460. Neither of these cases involved a challenge to the Secretary's approval of a State Plan Amendment or the appropriate level of deference required to be afforded to such approvals.

Similarly, the Supreme Court's decision in <u>Chase Bank U.S.A, N.A. v. McCoy</u>, 131 S. Ct. 871 (2011), cited by the Director for the proposition that an agency's amicus brief deserves deference, does not compel a contrary result.  This is so because that case involved an agency's interpretation of its own regulation rather than the statutory scheme (continued...)

1  The Court does not believe that the Court of Appeals for the District of Columbia

2  Circuit's determination in PhRMA v. Thompson, 362 F.3d 817, 822 (D.C. Cir. 2004),

3  compels a contrary result in this case.  Here, the decision of the Associate Regional

4  Administrator of the Division of Medicaid & Children's Health Operations approving the

5  SPA, as set forth in the October 27 approval letter, is conclusory in nature.  It does not

6  provide any reasons on its face as to why provider costs should not be considered in

7  determining whether the SPA's rate reduction will result in lower quality of care or

8  decreased access to services.  Given the logical and empirical relationship between

9  reimbursement rates and the willingness of providers to make services available that the

10  Ninth Circuit found was the case in Orthopaedic Hospital, the absence of a reasoned

11  decision to not require cost studies to justify the SPA makes the decision to approve the

12  SPA less appropriate for Chevron deference.  Further, the record reflects that CMS states

13  even though it "does not currently interpret [Section 30(A)] of the Act to require cost

14  studies in order to demonstrate compliance," CMS is "currently reviewing and refining,

15  in a rulemaking proceeding, guidance on how states can adequately document access to

16  services," suggesting that a formal notice and comment rulemaking process,

17  accompanied by the procedural safeguards of such a proceeding, is contemplated by

18  CMS.  See Dkt. No. 23-2, at 1; June 17, 2011 Letter from CMS to DHCS.  Besides the

19  fact that no explanation is given for not requiring cost studies other than the statement

20  that CMS "believe[s] the appropriate focus in on access," this statement by CMS

21  suggests that its position regarding cost studies is not necessarily settled.  Thus, although

22  the court noted in PhRMA that Chevron deference may be warranted even when no

23  / / /

24

25

26

_____

27   [8](...continued)

28  itself.  See id., 131 S. Ct at 880.

administrative formality was required and none was afforded, the circumstances of this case call into question whether <u>Chevron</u> deference is appropriate.[9]

Having determined that <u>Chevron</u> deference is inappropriate, the Court now turns to whether the Secretary's interpretation that cost studies are not required under Section 30(A) is "entitled to respect" under <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944).

The Court answers this question in the negative.  <u>Skidmore</u> instructs that "[t]he weight accorded to an administrative judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control." 333 U.S. at 140.  <u>Skidmore</u> respect is not owed for two reasons.  First, in apparent conflict with the Secretary's position in this case, in <u>Alaska</u>, the Secretary asked the Ninth Circuit to uphold her disapproval of a State Plan Amendment because Alaska failed to analyze provider costs.  Specifically, the Secretary argued:

> The requirements of § 1396(a)(30)(A) are . . . not so flexible as to allow the [State] to ignore the costs of providing services.  For payment rates to be consistent with efficiency, economy, quality of care and access, they must bear a reasonable relationship to provider costs.

<u>Alaska</u>, Resp. Br., 2004 WL 3155124, at 32 (citing <u>Orthopaedic Hospital</u>, 103 F. 3d at 1499).[10]  In addition to this inconsistency in agency position, the Secretary's proffered interpretation directly contradicts the law in the Ninth Circuit.  <u>See</u> <u>Orthopaedic</u>

---

[9] Further, in <u>PhRMA</u>, not only did the record support the reasonableness of the Secretary's decision that the SPA at issue would make it less likely that needy persons would become eligible for Medicaid, thereby impacting Medicaid services, the court noted that an intervening decision of the Supreme Court supported the trial court's decision to grant summary judgment in favor of the Secretary.  362 F. 3d at 821.

[10] Importantly, under <u>Skidmore</u>, courts consider whether the agency has acted consistently.  <u>See</u> <u>Federal Express Corp. v. Holowecki</u>, 552 U.S. 389, 399 (2008); <u>Good Samaritan Hosp. v. Shalala</u>, 508 U.S. 402, 417 (1993).

<u>Hospital</u>, 103 F. 3d at 1497.  Thus, while the Court recognizes that in appropriate circumstances, an agency may change its position on the construction of a statute, the Court finds that in light of the circumstances of this case, the Secretary's conclusory interpretation that Section 30(A) does not require consideration of cost studies is of limited "power to persuade," and is therefore not entitled to respect under <u>Skidmore</u>.

Accordingly, because CMS failed to consider whether DHCS relied on responsible cost studies, the Court finds that CMS failed to consider a relevant factor, and therefore that there is a strong probability that its approval of SPA 11-009 will be found to be arbitrary and capricious.

In any event, the Court finds that whether the Secretary's interpretation of Section 30(A) as embodied in the approval of SPA 11-009 is owed deference presents a "serious question going to the merits."  <u>See</u> <u>Alliance for the Wild Rockies</u>, 632 F.3d at 1132; <u>ILC II</u>, 572 F. 3d at 657–58; <u>Sierra On-Line, Inc.</u>, 739 F.2d at 1421.  In light of the balance of the hardships, which the Court believes tips strongly in plaintiffs' favor as discussed below, the Court finds that the issuance of a preliminary injunction is warranted.

### c.    Access to Quality Services

Before considering plaintiffs attacks on the specific analyses employed by the CMS, the Court first addresses plaintiffs' arguments regarding CMS' general methodology.

Plaintiffs contend that contrary to the Secretary's approval letter, the content of the administrative record before the Secretary did not "demonstrate a baseline of beneficiary access that . . . is consistent with Section 30(A)."  Mot. at 13.  According to plaintiffs, the Director's access analyses failed to include a meaningful comparison of the Medi-Cal population to the general population, any analysis of access on a local geographic level, any analysis based on the actual healthcare needs of the Medi-Cal population, or any attempt to project the rate reduction's impact on access to quality services.  <u>Id.</u> at 14.

In opposition, the Secretary argues that CMS properly considered all Section 30(A) factors.  According to the Secretary, CMS reasonably concluded based on the evidence before it that the rate reduction would not harm beneficiary access to services.  Secretary's Opp'n at 15.  Additionally, the Secretary argues that the monitoring plan submitted by the State makes clear that it is addressing access to high quality care.[11]  Id. at 13.  Further, the Secretary asserts that independent provisions of federal and state law ensure high quality of care.  Id.

The Court finds that plaintiffs have shown a substantial likelihood of success on the merits of their claim that CMS' acceptance of DHCS' access analyses and monitoring plan was arbitrary and capricious.  In this regard, the Court finds significant that DHCS' access analyses failed to include projections of what impact the rate reduction would have on beneficiary access or comparisons of Medi-Cal payment rates to Medicare payment rates, average commercial payment rates or provider costs.[12]  Furthermore, DHCS' analyses lack any meaningful geographic comparisons.[13]  This is so because DHCS reviewed access by "geographic peer groups," which apparently have nothing to do with geographic proximity and include providers from disparate regions of

_____

[11] Under the State's plan, DHCS will monitor a set of "early warning" measures, including change in Medi-Cal enrollment, provider participation rates, and calls to the Medi-Cal help line.  Any indication of a reduction in beneficiaries' access to services would trigger a prompt response from DHCS, and if DHCS concludes that an access problem results from a reduction in payment, DHCS will "immediately take action to change the payment levels.  DHCS is required to abide by the monitoring plan as a condition of CMS' approval of SPA 11-009.

[12] The Court notes that in a proposed rulemaking, CMS proposed that an access review should include comparisons of Medicaid payments to either Medicare payment rates, the average commercial payment rates, or the applicable Medicaid allowable costs. 76 Fed. Reg. at 26361.

[13] As noted above, Section 30(A) requires that care and services be available to Medi-Cal beneficiaries at least to the extent they are available to the general population in the geographic area.

the State.  Next, the Court finds it likely that the Secretary's acceptance of the monitoring plan as adequately ensuring access to quality services will also be found to be arbitrary and capricious.  This is so because the monitoring plan merely creates a potential response after an access problem has been identified.  To the extent reduced rates cause providers to close their doors, increased rates will not necessarily result in the reopening of those facilities.  More fundamentally, during the period between the detection of an access problem and its potential remedy through increased reimbursements, Medi-Cal beneficiaries will necessarily suffer from reduced access to services.  Finally, the Ninth Circuit has found it unreasonable to rely on independent provisions of federal and state law to ensure quality of care, precisely what the monitoring plan purports to do here.  See Orthopaedic Hospital, 103 F. 3d at 1497 ("The Department, itself, must satisfy the requirement that the payments themselves be consistent with quality care.").[14]

### i.    Physician and Clinic Services

According to plaintiffs, despite overwhelming evidence that Medi-Cal rates prior to the rate reduction did not ensure sufficient access to care, the Director erroneously determined that a ten percent reduction would not adversely affect beneficiary access.  Mot. at 16.  Plaintiffs point to several purported defects in the Director's methodology including that: (1) the Director "consistently and grossly overrepresents" the number of physicians in California and the number participating in Medi-Cal; (2) the Director consistently fails to adjust his counts of physicians to his counts of beneficiaries when calculating beneficiary to physician ratios; (3) the Director's utilization data is inadequate because it does not account for the level of patient need; and (4) the

---

[14] For the reasons stated above, the Secretary's contrary interpretation in this case is not owed Chevron deference because the approval of a State Plan Amendment does not include the "hallmarks of 'fairness and deliberation'" to which deference is owed.  See Alaska, 424 F. 3d at 939 (quoting Mead, 533 U.S. at 226–27)

utilization data is inadequate because it does not account for the type of provider serving the beneficiary or the location of service.[15] Id. at 16.

In opposition, the Secretary argues that CMS considered all information before it, and determined that the proposed rate cuts would not harm access. Secretary's Opp'n at 18. Further, the Secretary maintains that much of the input from providers was "very general" and did no provide specific examples or data on beneficiary impact. Id. The Secretary also contends that CMS considered the various studies and research literature included in the record, and concluded that these did not undermine the State's conclusion that the State's conclusion would not harm beneficiary access. Id. (citing Fan Decl. ¶ 5). The Secretary highlights that the studies upon which plaintiffs rely do not account for the fact that Medi-Cal beneficiaries rely heavily upon federally qualified health centers ("FQHCs") and rural health clinics ("RHCs"), which were not subject to the rate reduction. Id. at 19. Finally, the Secretary argues that there was no information in the record indicating that the data provided by the State was erroneous, but instead that the State relied on data that CMS considers reliable. Id.

The Court agrees with plaintiffs that the specific methodology by which the Director analyzed beneficiary access to physician and clinic services was likely fundamentally flawed. In this respect, the Court finds two factors particularly

---

[15] In support of their argument that the Director's analyses were fatally flawed, plaintiffs submit the declarations of two purported experts, Drs. Grumbach and Zuckerman. The Secretary argues that the experts' declarations were not before the agency and therefore should not be considered by the Court. Secretary's Opp'n at 16. This argument is not persuasive. A court may accept evidence outside the administrative record "to permit explanation or clarification of technical terms or subject matter involved in the agency action under review" or "for background information." Public Power Council v. Johnson, 674 F.2d 791, 794 (9th Cir. 1982); see also Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980). Plaintiffs properly introduce the expert declarations to provide background as to the information before CMS with respect to its finding that access to services would not be impaired by the rate reduction. The Court considers the experts' declarations exclusively for this purpose.

concerning.  First, the Director based his conclusion that Medi-Cal beneficiaries continued to have access to services on data related to how many physicians submitted at least one claim per year to Medical.  The fact that a given number of physicians have submitted at least one claim per year to Medi-Cal does not necessarily reflect that those physicians see Medi-Cal patients on a regular basis.  Next, the Court is troubled by DHCS' reliance on FQHCs and RHCs to serve beneficiaries.  Even if Medi-Cal beneficiaries heavily utilize FQHCs and RHCs, it does not constitute comparable access to care within the meaning of Section 30(A) to effectively limit Medi-Cal beneficiaries to such facilities.

### ii.   Dental Services

Plaintiffs maintain that CMS and other governmental agencies have for years identified a lack of access to dental services for Medi-Cal beneficiaries.  Mot. at 17.  According to plaintiffs, in response to continuing access problems, in 2001, CMS issued a letter to all State Medicaid Directors in which it stated that "significant shortfalls in beneficiary receipt of dental services, together with evidence that Medicaid reimbursement rates fall below the 50th percentile of providers' fees in the marketplace, create a presumption of noncompliance" with Section 30(A).  Id. (citing Crall Decl. Ex. 11).  Since that time, plaintiffs assert that CMS has targeted California as one of 16 states with low dental utilization rates, and a 2010 Government Accounting Office report stated that California had the seventh lowest dental utilization rate in the United States.  Id. (citing Crall Decl. Ex. 2; Crall Decl. Ex. 4).  In this context, plaintiffs argue that it was arbitrary and capricious for CMS to approve SPA 11-009 as to pediatric dental services.  Further, plaintiffs assert that the Director relied on erroneous data relating to dental utilization rates.  In support of this argument, plaintiffs points to that the utilization statistics reported by the Director in his analysis are between 13.8 and 17 percentage points higher than what the Director annually reports to CMS and what other research reports.  Id. at 18 (citing Cannizzo Decl. Ex. 5–9).  Further, plaintiffs note that the Director's count of dentists participating in Medi-Cal for 2008 outnumbers those

1   reported by the Centers for Disease Control without explanation.  Id. (citing Cannizzo

2   Decl. Ex. 10).

3        In opposition, the Secretary argues that the State's access study showed that the

4   percentage of Medi-Cal enrolled children between the ages of zero and 20 with an

5   annual dental visit between 2007 and 2009 was in line with the national average.

6   Further, according to the Secretary, the State's analysis showed that the percentage of

7   children using dental services increased from 45.3% in 2007 to 49.2% in 2009, lending

8   further support to CMS's conclusion that the rate reduction would not negatively affect

9   access.  Secretary's Opp'n at 20.  The Secretary also contends that there is no conflict

10  between the data presented in the State's access analysis and the data in the Director's

11  submissions to CMS because the methodologies used in each analysis is distinct.

12  Finally, the Secretary argues that plaintiffs' claim that there are large geographic areas of

13  California where Medi-Cal beneficiaries cannot access dental services is "vastly

14  overstated" as CDC's State Oral Health Profile shows that 53 out of 58 counties have an

15  enrolled Medicaid dentist.  Id. at 21 (citing Dkt. No. 79-3, Ex. 10).

16       The Court believes plaintiffs' arguments are persuasive.  In reaching this

17  conclusion, the Court finds significant that CMS' State Medicaid Director Letter

18  established that a low beneficiary utilization rate along with reimbursement rates that fall

19  below 50 percent of providers' fees in the marketplace "create a presumption of

20  noncompliance" with Section 30(A).  Crall Decl. Ex. 11.  Because neither CMS nor

21  DHCS provide any evidence that Medi-Cal's reimbursement rates are above 50 percent

22  of providers' fees and California's utilization rate is among the lowest in the country,

23  that presumption should apply here.  Further, the Court also finds concerning that CMS

24  acknowledges that only 53 of 58 counties have a Medi-Cal enrolled dentist, and that

25  even in those counties, CMS apparently had no information before it to suggest that

26  beneficiaries had comparable access to dentists as the general population.

27  / / /

28  / / /

### iii.    Pharmacy Services

Plaintiffs argue that the record before CMS demonstrated that the Director could not lawfully implement the rate reduction with respect to pharmacy services.  Mot. at 18.  In this respect, plaintiffs maintain that CPhA provided evidence to CMS demonstrating that the rate reduction would result in pharmacies being paid less than their costs for most drugs and in turn to decreased beneficiary access as a result of pharmacies refusing to provide services to Medi-Cal patients.  Id.  Plaintiffs assert that the Director's analysis included "several deficiencies" including that it relied on pharmacy utilization, which plaintiffs maintain is not an accurate indicator of access.  Id.  Finally, plaintiffs contend that "[b]ecause the Director failed to conduct a competent access study," on December 16, 2011, he was "forced to acknowledge" that for certain drugs, providers, or geographic areas, the ten percent reduction may impede access to selected Medi-Cal drug benefits and "'possibly result in a violation of federal Medicaid law.'"  Id. (quoting DHCS Proposal to Adjust Provider Payment Reductions for Selected Medi-Cal Drug Product Payments).

The Secretary responds that her approval of the Director's analysis was not arbitrary and capricious because: (1) California pays pharmacies based on Average Wholesale Price ("AWP"), an extremely inflated payment method with no real bearing on the actual cost pharmacies pay for drugs;[16] (2) the AWP metric would allow Medi-Cal pharmacies to still realize a profits even after the rate reduction; and (3) in 2008, when a prior rate reduction was in effect, Medi-Cal utilization rates for pharmacy services increased.  Secretary's Opp'n at 21–22.

The Court finds that there are two particular areas of concern regarding CMS' analysis of the rate reduction's impact on access to pharmacy services.  First, the Secretary's argument regarding how pharmacies are reimbursed appears to rest on a

---

[16] AWP was found to be an inflated price metric in In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 67–60 (D. Mass. 2005).

misunderstanding of Medi-Cal pharmacy reimbursement.  In this respect, Medi-Cal does not reimburse pharmacies the full amount of a drug's AWP.  Instead, reimbursement is calculated by subtracting 17 percent from AWP.  Cal. Welf. & Inst. Code § 14105.45(b)(3).  Accordingly, California already accounts for the fact that AWP has been found to be an inflated price metric.  Second, the Court does not believe utilization data is an accurate indicator of access in the pharmacy context because it reflects only whether a pharmacy services Medi-Cal beneficiaries.  It fails to capture whether a pharmacy refuses to dispense a particular drug as a result of inadequate reimbursement.

### iv.   EMT Services

Plaintiffs' arguments regarding the CMS' analysis of the rate reduction on EMT services overlap with their general objections described above.  Although the Court agrees with plaintiffs that the Director's access analysis inadequately considered provider costs and improperly relied on independent provisions of state and federal law which mandate the provision of EMT services, the Court declines to recreate its discussion on these points.

### v.   DME and Supply Services

Plaintiffs contend that based on the evidence in the record, CMS' approval of SPA 11-009 with respect to DME was arbitrary and capricious.  Mot. at 20.  According to plaintiffs, CMS should have known that a ten percent rate reduction could not be implemented without reducing the services provided to Medi-Cal beneficiaries because DME providers only average a five percent pretax profit margin.  Id. at 21.  Further, plaintiffs argue that there was no analysis with respect to medical suppliers and that CMS "had no basis" upon which to conclude that access would be preserved after the implementation of the rate reduction.  Id.

The Secretary responds that the Director's access analysis indicates that utilization of DME services remained constant over a three-year period despite earlier cuts, with fluctuations upward, and that the number of available suppliers has increased as enrollment has expanded.  Opp'n at 24.  The Secretary argues that plaintiffs' assertion

that a ten percent rate reduction would necessarily result in reduction of access relies on the faulty assumption that providers are incapable of adapting to new rates.  Id. at 25. Further, the Secretary maintains that it was reasonable for CMS to credit the Director's analysis over "self-serving"survey responses from DME suppliers.[17]

The Court does not believe the CMS' analysis of the rate reduction contained specific flaws particular to DME services.  However, because the Court believes the Director's analysis did not properly consider provider costs and failed to include a projection of the rate reduction's impact on access to DME services, the Court finds that plaintiffs have shown that they are likely to prevail on their claim that CMS' approval of SPA 11-009 with respect to DME supply services was arbitrary and capricious.

In sum, the Court believes plaintiffs are likely to succeed on the merits of their claim that CMS' acceptance of the access analyses and monitoring plan was arbitrary and capricious, and in any event, that the issue at least presents a "serious question going to the merits."  Because the Court finds that the balance of hardships tips strongly in plaintiffs' favor, a preliminary injunction is appropriate on this basis as well.  See Alliance for the Wild Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at 1421.

## 2. Plaintiffs' Section 30(A) Claim Against the Director

The Director argues that plaintiffs are unlikely to succeed on the merits of their Section 30(A) claim because they have no basis for asserting a private right of action under Section 30(A).  Director's Opp'n at 22.  The Director further contends that even if plaintiffs have a private right of action, they cannot demonstrate that AB 97 violates, and

---

[17] The Secretary notes that "medical supply services" are not included in the definition of DME, but are instead listed as a subcategory of "home health services." Secretary's Opp'n at 24 n. 16 (citing 42 U.S.C. § 1395x(m)(4), (n).  Therefore, according to the Secretary, because the State declined to implement the rate reduction for home health services, "medical supply services" are not subject to the rate reduction.  The Court does not believe this to be the case because medical supplies are explicitly listed on Supplement 15 of Attachment 4.19-B of the California State Plan as subject to the Rate Reduction.

is thus preempted by, Section 30(A).  In support of this argument, the Director points to CMS' approval of SPA 11-009, which the Director contends is owed deference.  Id. at 18–20.

At this juncture, the Director's argument that plaintiffs lack a private right of action to enforce Section 30(A) fails.  While plaintiffs lack a private right of action under 42 U.S.C. § 1983, see Develop. Servs. Network v. Douglas, No. 11-55851 slip op. at 20533 (9th Cir. Nov. 30, 2011), Ninth Circuit case law establishes that Section 30(A) is enforceable by private parties under the Supremacy Clause.  See ILC I, 543 F. 3d at 1050-52; ILC II, 572 F. 3d at 644; Cal. Pharms. I, 563 F. 3d at 850–51.  Although this issue is presently before the Supreme Court, unless and until this precedent is overruled, it controls here.  See Hart v. Massanari, 266 F. 3d 1155, 1171 (9th Cir. 2001).  For the reasons articulated in Section B(1) supra, the Court finds that plaintiffs are likely to succeed on their claim that DHCS' failure to consider responsible cost studies and failure to adequately consider the effect of the rate reduction on access to and quality of care may be found to have violated Section 30(A).  As noted above, the Court finds that these issues at least present "serious questions as to the merits" of plaintiffs' claim, and that the balance of hardships tips strongly in plaintiffs' favor.  See Alliance for the Wild Rockies, 632 F.3d at 1132; ILC II, 572 F. 3d at 657–58; Sierra On-Line, Inc., 739 F.2d at 1421.

### 3.    Plaintiffs' Takings Clause Claim

Plaintiffs assert that the rate reduction violates the Takings Clause of the Fifth Amendment of the U.S. Constitution as incorporated against the states through the Fourteenth Amendment of the U.S. Constitution.  FAC ¶¶ 73–79.  Plaintiffs argue that due to state laws that require EMT providers and emergency room physicians to provide emergency medical services regardless of a patient's ability to pay, the Director's failure to adequately reimburse these providers for their services constitutes an unlawful taking of their property without just compensation.  Mot. at 22.

/ / /

The "Takings Clause" of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. "In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he possesses a 'property interest' that is constitutionally protected." Turnacliff v. Westly, 546 F. 3d 1113, 1118–19 (9th Cir. 2008) (internal citations omitted).

The Court does not believe that plaintiffs have shown a likelihood of success on their Takings Clause claim. Ordinarily, a "[g]overnmental regulation that affects a group's property interests 'does not constitute a taking of property where the regulated group is not required to participate in the regulated industry.'" Burditt v. U.S. Dept. Of Health and Human Services, 934 F.2d 1362, 1376 (5th Cir. 1991) (quoting Whitney v. Heckler, 780 F.2d 963, 972 (11th Cir. 1986)). In this case, plaintiffs' claim for unlawful taking fails because plaintiffs do not have a protected property interest. In this regard, the emergency room physicians and EMT providers voluntarily elect to provide emergency medical services, thereby accepting the various restrictions on their services, including statutory requirements to treat all patients whether such patients are privately insured, uninsured, or covered under Medi-Cal. Because these providers are under no legal compulsion to continue providing emergency medical care, there is no valid property interest subject to a claim under the Takings Clause.

## C.    Risk of Irreparable Injury

Plaintiffs contend that the rate reduction will cause irreparable harm in two principal ways. First, plaintiffs argue that Medi-Cal providers will suffer substantial monetary losses as a result of the rate reduction, forcing them to severely curtail their services or close their businesses entirely. Next, as a result of these service reductions, plaintiffs contend that Medi-Cal beneficiaries will suffer severely limited access to care. Mot. at 23–24.

In opposition, the Director first argues that injury to individual providers is not a proper basis for injunctive relieve. Director's Opp'n at 3. In any event, the Director argues that the declarations of individual providers upon which plaintiffs rely confirm

1    that the rate reduction will not cause irreparable harm because these declarants assert

2    that they have accepted inadequate Medi-Cal reimbursement in the past.  Id. at 4–5.

3    Further, the Director argues that CMS' approval of SPA 11-009 means that beneficiaries

4    will not suffer reduced access to services, and that in any event, the monitoring plan

5    California has adopted mitigates any potential access problem.  Id. at 7–9 (citing Midgett

6    v. Tri-County Metro. Transp. Dist. of Or., 254 F. 3d 846, 850 (9th Cir. 2001) (holding

7    that a defendant's procedures for monitoring compliance in the ADA context "show that

8    Plaintiff does not face a threat of immediate irreparable harm without an injunction")).

9         The Court finds that plaintiffs have met their burden of showing irreparable harm

10   in the absence of an injunction.  In reaching this conclusion, the Court rejects the

11   contention that California's monitoring plan will necessarily prevent beneficiaries from

12   being harmed.  As discussed above, the Court believes that the monitoring plan at best

13   presents a potential remedy *after* an access problem has been detected.  Even if the

14   monitoring plan could ensure that beneficiary access to services would not be reduced on

15   the aggregate, the Ninth Circuit has held that as long as there is evidence showing that at

16   least some Medi-Cal beneficiaries might lose services as a result of a rate reduction,

17   irreparable harm is adequately demonstrated.  Cal. Pharms. Ass'n v. Maxwell-Jolly, 596

18   F. 3d 1098, 1114 (9th Cir. 2010) ("Cal. Pharms. II").  Here, plaintiffs have proffered

19   substantial evidence that Medi-Cal providers will reduce or eliminate their services in

20   response to the implementation of the rate reduction, suggesting that at least some

21   beneficiaries would suffer reduced access to services.  See, e.g., Sprau Decl. ¶ 10

22   (pulmonologist and critical care physician will not accept new Medi-Cal patients);

23   Chiang Decl. ¶ 18 (dentist will close office dedicated to serving Medi-Cal patients);

24   Dunkel Decl. ¶ 9 (pharmacist will not accept new Medi-Cal patients or fill all Medi-Cal

25   prescriptions); Stidham Decl. ¶¶ 7–10 (AHF no longer able to provide same level of

26   services to Medi-Cal beneficiaries with HIV or AIDS).  Furthermore, because providers

27   would be barred from recovering any reimbursement shortfall in an action at law due to

28   California's Eleventh Amendment immunity, the Court finds plaintiffs have shown

adequate irreparable injury to support an injunction on this basis as well.  See Cal.
Pharms. I, 563 F. 3d at 850–52.[18]

### D.      Balance of Hardships and Public Interest

The Director argues that injunctive relief would have a serious impact on the
continuing financial health of the State of California.  Director's Opp'n at 25.  The
Director also maintains that the public will suffer harm if an injunction issues because
any injunction that prevents the implementation of a state statue inflicts injury on the
State.  Director's Opp'n at 24 (citing Coalition for Economic Equity v. Wilson, 122 F.
3d 718, 719 (9th Cir. 1997)).

Although cognizant of the State's fiscal difficulties, the Court believes that the
balance of the equities and the public interest strongly favor the issuance of an
injunction.  In reaching this conclusion, the Court notes that the Ninth Circuit has held
that the injury to a state caused by the injunction of one of its statutes does not outweigh
the public's interest in ensuring that state agencies comply with the law and protect
beneficiaries' access to services.  ILC II, 572 F. 3d at 658; Cal. Pharms. II, 596 F. 3d at
1114–15.  Similarly, the State's fiscal crisis does not outweigh the serious irreparable
injury plaintiffs would suffer absent the issuance of an injunction.  See ILC II, 572 F. 3d
at 658–59 ("State budgetary considerations do not . . . in social welfare cases, constitute
a critical public interest that would be injured by the grant of preliminary relief.  In
contrast, there is a robust public interest in safeguarding access to health care for those
eligible for Medicaid."); see also Golden Gate Restaurant Ass'n v. City and County of
San Francisco, 512 F. 3d 1112, 1126 (9th Cir. 2008) (Where "there is a conflict between
financial concerns and preventable human suffering . . . , the balance of hardships tips
decidedly in favor of the latter.").

---

[18] In this respect, the Director's argument that monetary loss to providers cannot be
a basis for an injunction is unavailing.  The Ninth Circuit has repeatedly rejected this
precise argument.  See, e.g., Cal. Pharms. I, 563 F. 3d at 850–51; ILC II, 572 F.3d at 658;
Cal. Pharms. II, 596 F. 3d at 1113–14.

### E.    Application of the State's Eleventh Amendment Immunity

At oral argument, the Director argued that the Court cannot enjoin the Director from implementing the rate reduction because such an injunction would violate California's Eleventh Amendment immunity.  Plaintiffs responded that an injunction restraining implementation of the rate reduction by the Director would not violate the State's Eleventh Amendment immunity because such relief would be prospective rather than retrospective in effect.  Although the Eleventh Amendment bars suits against states in both law and equity, a plaintiff may nonetheless maintain a federal action to compel a state official's prospective compliance with the plaintiff's federal rights.  Ex Parte Young, 209 U.S. 123, 156 (1908) ("The State has no power to impart to [its officer] any immunity from responsibility to the supreme authority of the United States.").  The Court may issue such an injunction even if the state's compliance will have an "ancillary effect" on the state treasury.  Edelman v. Jordan, 415 U.S. 651, 662–63 (1974).  However, this exception applies only to prospective relief; it does not permit retroactive injunctive relief.  Id. at 668.  The Court finds that to the extent the Director has already reimbursed providers for claims made after June 1, 2011, enjoining the Director from implementing the rate reduction would not violate the State's Eleventh Amendment immunity.  This is so because such an injunction would merely preclude the Director from recovering funds already distributed.  However, insofar as the Director has not yet reimbursed providers for services rendered between June 1, 2011, and the date of this order, the Court finds and concludes that an injunction restraining the implementation of the rate reduction would be contrary to the State's Eleventh Amendment immunity.  In this respect, the Court is guided by the Ninth Circuit's explanation that "whether relief is prospective or retrospective in the Medicaid payment context turns on the date of service, not the date of payment."  ILC II, 572 F.3d 661, n. 19.  Under this definition, an injunction precluding the Director from reducing payments for services already rendered would constitute a retrospective award of damages in violation of the Eleventh Amendment.

**F.     Director's Motion for a Stay Pending Appeal**

At oral argument, the Director orally moved for a stay of the preliminary injunction pending his appeal of this order.  In deciding whether to issue a stay pending appeal, the Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  See Golden Gate Rest. Ass'n v. City & County of S.F., 512 F.3d 1112, 1115 (9th Cir. 2008) (citations omitted).  The Court finds that the relevant factors do not weigh in favor of granting the Director's motion.  Most importantly, there is no evidence that the Director will suffer irreparable injury absent a stay.  By contrast, an issuance of a stay would substantially injure plaintiffs because providers would continue to lose considerable revenue that cannot be recouped and because Medi-cal beneficiaries would suffer from reduced access to services.  Accordingly, the Court DENIES the Director's motion for a stay pending appeal.

**IV.     CONCLUSION**

In accordance with the foregoing, the Court hereby GRANTS plaintiffs' motion for a preliminary injunction, and DENIES the Director's motion for a stay pending appeal.

IT IS HEREBY ORDERED as follows:

Defendant Toby Douglas, Director of the California Department of Health Care Services, his employees, his agents, and others acting in concert with him with actual notice of this order shall be, and hereby are, enjoined and restrained from violating federal law by implementing or otherwise applying the reduction of Medi-Cal reimbursement for services provided by physicians, clinics, dentists, pharmacists, ambulance providers and providers of medical supplies and durable medical equipment on or after June 1, 2011 for which the Director has already provided reimbursement, pursuant to Assembly Bill 97 enacted by the California Legislature in March 2011, as

codified at California Welfare and Institutions Code § 14105.192, or to any other degree reducing current Medi-Cal rates for such services.  This injunction does not preclude the Director from applying the rate reduction to services rendered between June 1, 2011, and the date of this order, for which reimbursement has not yet been provided.

IT IS HEREBY FURTHER ORDERED that, consistent with the  foregoing, the October 27, 2011 decision by Defendant Kathleen Sebelius, Secretary of the Department of the United States Department of Health and Human Services, approving the Medi-Cal reimbursement reduction codified at Welfare and Institutions Code § 14105.192, is hereby stayed.

Dated: January 31, 2012

_____
CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE

30